2004-NMSC-009

89 P.3d 47

**STATE of New Mexico, ex rel. Eluid L. MARTINEZ, State Engineer, Plaintiff–Respondent,**

v.

**CITY OF LAS VEGAS, Defendant–Petitioner.**

No. 22,283.

Supreme Court of New Mexico.

April 7, 2004.

White, Koch, Kelly & McCarthy, P.A., Paul L. Bloom, Benjamin Phillips, Santa Fe, NM, for Petitioner.

Office of the State Engineer, D.L. Sanders, General Counsel, Christopher Bulman, Special Assistant Attorney General, Santa Fe, NM, for Respondent.

Community & Indian Legal Services, Inc., David Benavides, Margret Carde, Santa Fe, NM, for Amicus Curiae Acequias.

Kastler Law Offices, Ltd., Paul A. Kastler, Raton, NM, Law & Resource Planning Associates, P.C., Charles T. DuMars, David Seeley, Albuquerque, NM, Amicus Curiae Storrie Project Water Users Association.

## OPINION

SERNA, Justice.

{1} In *Cartwright v. Public Service Co. of New Mexico*, 66 N.M. 64, 79–85, 343 P.2d 654, 664–69 (1958), this Court adopted the pueblo rights doctrine. Under this doctrine, municipalities that are the successors-in-interest to colonization pueblos established by antecedent sovereigns possess a pueblo water right. This water right entitles a municipality to take as much water from an adjacent water course as necessary for municipal purposes and permits expansion of the right to accommodate increased municipal needs due to population increases. Upon reexamination, we conclude that the pueblo rights doctrine is inconsistent with New Mexico's system of prior appropriation. As a result, we overrule *Cartwright*. We conclude that municipal water rights must be determined by prior appropriation based on beneficial use regardless of a colonization grant from preceding sovereigns.

{2} The present case arose as a subfile proceeding in the course of a general adjudication of water rights in the Pecos River system. The State Engineer sought a declaration of the water rights of the City of Las Vegas on the Gallinas River. Specifically, the State Engineer challenged the existence

of pueblo water rights in New Mexico. In the alternative to arguing that New Mexico should no longer recognize pueblo water rights in general, the State Engineer challenged the City's specific entitlement to a pueblo water right and disputed the application of the City's pueblo water right to groundwater, reservoirs, industrial uses, and water distribution outside the city limits. On the basis of stare decisis, the district court declined to rule on the State Engineer's general challenge to the pueblo water rights doctrine, as well as the City's entitlement to a pueblo water right. However, the court found in favor of the State Engineer on the parameters of the City's pueblo right. On appeal, the Court of Appeals determined that this Court, if presented with the opportunity, would overrule our prior cases establishing the pueblo water rights doctrine, and the Court therefore declined to follow this established precedent. *State ex rel. Martinez v. City of Las Vegas*, 118 N.M. 257, 265, 880 P.2d 868, 876 (Ct.App.1994). The Court of Appeals concluded that the City had no pueblo water right. *Id.* We granted the City's petition for writ of certiorari to the Court of Appeals. Although we conclude that stare decisis requires the Court of Appeals to follow this Court's cases, we independently determine that the pueblo rights doctrine is flawed and that the cases recognizing this doctrine must be overruled. However, we also conclude that reliance interests and concerns for the proper administration of justice require a limited prospective application of our overruling of prior case law to the City.

## I. Facts and Procedural Background

### A. Early Developments

{3} The pueblo of Nuestra Senora de Las Dolores de Las Vegas was established on the Gallinas River by a colonization grant from the Republic of Mexico on March 23, 1835. *See Maese v. Herman,* 183 U.S. 572, 573–76, 22 S.Ct. 91, 46 L.Ed. 335 (1902). After settlement, the Town of Las Vegas became a part of the United States with the Treaty of Guadalupe Hidalgo in 1848. *See* Treaty of Peace Between the United States and Mexico, Feb. 2, 1848, U.S.-Mex., 9 Stat. 922. Congress confirmed the grant to the Town in 1860, and the Town received a patent from the United States government in 1903. In addition, the Legislature established a board of trustees that would have the power of "control and management of the tract of land known as the Las Vegas land grant." NMSA 1978, § 49–6–2 (1909). The Legislature established the board as a separate legal entity from the Town of Las Vegas, *see City of Las Vegas v. Oman,* 110 N.M. 425, 428, 796 P.2d 1121, 1124 (Ct.App.1990), which had only the authority specifically delegated by statute. Among other things, the Legislature authorized the board "to lease, sell or mortgage any part or parts of said tract of land," without prejudice to any vested rights to land within the grant. NMSA 1978, §§ 49–6–9 (1903), –10 (1909).

{4} Separately from the settlement under the 1835 colonization grant, a settlement on the east side of the Gallinas was established in 1841. This settlement, known as the City of Las Vegas, expanded dramatically after the arrival of the railroad in 1879. In 1880, San Miguel County issued a fifty-year franchise to Agua Pura Co. to provide municipal water to the inhabitants of the two settlements. *See Cartwright v. Pub. Serv. Co. of N.M.,* 66 N.M. 64, 72, 343 P.2d 654, 659–60 (1958). In 1970, a consolidation of the two separate settlements, the Town of Las Vegas and the City of Las Vegas, formed the current City of Las Vegas.

{5} Water rights on the Gallinas have been the subject of a number of judicial and administrative proceedings. While these proceedings are described in greater detail in *Oman,* 110 N.M. at 428–29, 796 P.2d at 1124–25, we will review some of the more important developments. In 1921, the district court of San Miguel County entered a decree, known as the Gallinas Decree, in a consolidated suit brought by various water users. The decree adjudicated a water right to the land grant board based on a permit issued by the State Engineer with a priority date of 1909. Agua Pura Co. was not a party to the Gallinas Decree. In 1933, in an attempt to adjudicate all surface water rights on the Gallinas, the federal district court entered a decree which is known as the Hope

Decree. Among other water rights, the Hope Decree adjudicated the right of New Mexico Power Co., the successor of Agua Pura Co., to 2600 acre feet per year with an 1881 priority.

## B. The Cartwright Litigation

{6} In 1955, a number of water users on the Gallinas filed an action in district court against Public Service Co. of New Mexico (PNM), the successor to New Mexico Power Co., claiming that PNM had trespassed on their senior water rights as adjudicated in the Hope Decree. *Cartwright,* 66 N.M. at 66, 343 P.2d at 655. The water users sought an injunction and damages. *Id.* The Town intervened in the action and claimed as an affirmative defense that PNM lawfully appropriated water under a pueblo water right belonging to the Town by virtue of the 1835 colonization grant. *Id.* at 67, 343 P.2d at 656. The district court found in favor of the Town and PNM on the basis of this affirmative defense. *Id.* at 68, 343 P.2d at 657. The court recognized the existence of the pueblo rights doctrine in New Mexico. *Id.* The court further found that the Town of Las Vegas and City of Las Vegas were the successors to the Mexican colonization grant. *Id.* at 67–68, 343 P.2d at 656. The court concluded that the Town possessed a pueblo water right with a priority date of 1835 and that PNM's right to divert water pursuant to the Town's pueblo water right was prior and paramount to the rights of the water users who had initiated the claim. *Id.* at 70–71, 343 P.2d at 658–59.

{7} On appeal, this Court addressed three issues: (1) whether the Hope Decree was res judicata as to PNM and the Town for purposes of precluding their reliance on the pueblo rights doctrine; (2) whether the trial court correctly found that the Town possessed a valid and superior claim to the colonization grant; and (3) whether the pueblo rights doctrine, as recognized by the courts of California, applies in New Mexico. *Id.* at 71–72, 343 P.2d at 659. We determined that the Hope Decree was not res judicata with respect to the Town or the City of Las Vegas because neither had been a party to the federal action. *Id.* at 76, 343

P.2d at 662. We also determined that there was substantial evidence in the record to support the district court's determination of the validity of the 1835 community colonization grant by the government of Mexico, as well as the court's recognition of the Town's superior claim to the grant, consistent with the opinion of the United States Supreme Court in *Maese,* 183 U.S. at 580–81, 22 S.Ct. 91. *Cartwright,* 66 N.M. at 78–79, 343 P.2d at 664. The remainder of our opinion in *Cartwright* focused on the controversial question of whether New Mexico should recognize the pueblo rights doctrine. *Id.* at 79–85, 343 P.2d at 664–69.

{8} As reviewed by this Court in *Cartwright,* the pueblo rights doctrine recognizes the right of the inhabitants of Mexican or Spanish colonization pueblos to use as much of an adjoining river or stream as is necessary for municipal purposes. *Id.* at 82, 343 P.2d at 666–67. The doctrine contemplates the expansion of the pueblo's right to use water in response to increases in size and population, and if necessary, the right can encompass the entire flow of the adjoining water course. *Id.* We noted in *Cartwright* that the doctrine had been recognized by the Supreme Court of California in a series of cases dating from 1860. *Id.* at 84, 343 P.2d at 667–68; *see Hart v. Burnett,* 15 Cal. 530 (1860) (discussing pueblo rights in relation to land); *see also Lux v. Haggin,* 69 Cal. 255, 10 P. 674, 714–15 (1886) (analogizing the principles from *Hart* to water rights).

{9} We attributed the historical basis of the doctrine to the Plan of Pitic. *Cartwright,* 66 N.M. at 81, 343 P.2d at 665–66. Prepared under the commandant-general of the internal provinces of the viceroyalty of New Spain, the Plan of Pitic served as the organizational design for the town of Pitic when it was founded in 1783. As ordered by the King of Spain, the Plan served as a model for the settlement of pueblos across the internal provinces, including New Mexico. *Cartwright,* 66 N.M. at 84, 343 P.2d at 668. The Plan conformed to the general principles established in the 1680 compilation of the laws governing New Spain, the Recopilación de Leyes de los Reynos de las Indias, which continued to be followed by the government

of the Republic of Mexico, after independence, at the time of the Las Vegas grant in 1835. We observed in *Cartwright* that the Plan of Pitic "gave the settlement preferred rights to all available water." *Id.*

{10} In discussing the applicability of the pueblo rights doctrine in New Mexico, we recognized that this State applies the doctrine of prior appropriation based on beneficial use, as derived from the civil law system of Spain and Mexico prior to the Treaty of Guadalupe Hidalgo. *Cartwright,* 66 N.M. at 80, 343 P.2d at 665. However, in response to an argument that the pueblo rights doctrine conflicts with New Mexico's system of prior appropriation, we explained that the pueblo rights doctrine is premised on the notion that colonization pueblos "were largely, if indeed, not always, established before there was any settlement of the surrounding area." *Id.* at 79–80, 343 P.2d at 665. As a result, we concluded that the paramount and superior nature of pueblo water rights conforms to the system of prior appropriation. *Id.* at 80, 343 P.2d at 665. "There were no questions of priority of use when a colonization pueblo was established because there were no such users." *Id.* at 85, 343 P.2d at 668. In addition, we concluded that the expanding nature of pueblo rights did not violate the principle of beneficial use.

> Water formed the life blood of the community or settlement, not only in its origin but as it grew and expanded. A group of fifty families at the founding of a colony found it no more so than when their number was multiplied to hundreds or even thousands in an orderly, progressive growth.

> And just as in the case of a private user, so long as he [or she] proceeds with due dispatch to reduce to beneficial use the larger area to which his [or her] permit entitles him [or her], enjoys a priority for the whole, so by analogy and under the rationale of the Pueblo Rights doctrine, the settlers who founded a colonization pueblo, in the process of growth and expansion, carried with them the torch of priority, so long as there was available water to supply the life blood of the expanded community.

*Id.* at 85, 343 P.2d at 668. Accordingly, the pueblo rights doctrine represented "the elevation of the public good over the claim of a private right." *Id.* at 85, 343 P.2d at 669. Based on our determination that the pueblo rights doctrine was not inconsistent with the doctrine of prior appropriation and beneficial use, we concluded that "the reasons which brought the Supreme Court of California to uphold and enforce the Pueblo Rights doctrine apply with as much force in New Mexico as they do in California." *Id.* at 85, 343 P.2d at 668.

{11} The dissenting opinion in *Cartwright* serves to highlight the most controversial aspects of the majority opinion. The dissent contains five primary criticisms of the majority opinion: (1) the actual language of the Plan of Pitic, as opposed to its interpretation by California courts, supports communal sharing of water inside and outside the pueblo's border rather than a paramount and superior right belonging exclusively to the pueblo; (2) the circumstances leading to the adoption of the pueblo rights doctrine in California, specifically a statutory basis for the doctrine and a communal theory of water law, do not exist in New Mexico; (3) the Treaty of Guadalupe Hidalgo does not protect a pueblo right as interpreted by the majority; (4) the premise of the pueblo rights doctrine that the pueblo precedes all other users on the stream does not apply to Las Vegas; and (5) the pueblo rights doctrine violates the fundamental principle of beneficial use. *Cartwright,* 66 N.M. at 94–105, 343 P.2d at 674–82 (Federici, D.J., dissenting). In response to a motion for rehearing, the dissent elaborated on the latter three of these reasons for disagreeing with the majority opinion. *Id.* at 106–19, 343 P.2d at 683–92. We discuss these points in greater detail below in the context of the State Engineer's arguments to this Court.

{12} Following our decision in *Cartwright,* the same plaintiffs filed a second claim for damages against PNM. *Cartwright v. Pub. Serv. Co. of N.M.,* 68 N.M. 418, 419, 362 P.2d 796, 796–97 (1961). The plaintiffs alleged that the colonization grant from Mexico belonged to the Town of Las Vegas Grant, meaning the board of trustees established by the Legislature, rather than to the Town of

Las Vegas. *Id.* at 419, 362 P.2d at 797. We held this claim to be res judicata based on our opinion in the first *Cartwright.* "[T]he ownership of the waters of the Gallinas River and its tributaries was the ultimate question to be determined in the first case, and ownership thereof was adjudicated as belonging to the City and Town of Las Vegas as successors to the original Mexican Pueblo." *Id.* at 420, 362 P.2d at 798.

## C. Present Developments

{13} Water rights adjudication on the Gallinas culminated in the present action. During the course of a general adjudication of the Pecos River stream system, the State Engineer filed a supplemental complaint in 1985 requiring the City of Las Vegas to declare its asserted rights to the use of water in the system, which includes the Gallinas as a tributary of the Pecos River. *Oman,* 110 N.M. at 431, 796 P.2d at 1127. In a subfile adjudication between the City and the State, the City asserted its pueblo water right under *Cartwright,* as well as additional water rights that include the City's interest as successor to the 1881 priority right recognized by the Hope Decree as belonging to New Mexico Power Co. The State Engineer challenged the validity of the pueblo rights doctrine, the legitimacy of the City's claim to be the successor to the 1835 colonization grant, and, in the alternative, the application of the City's pueblo water right to groundwater, reservoirs, industrial uses, uses outside the city limits, and return flows from waste treatment facilities. After the district court denied cross motions for summary judgment by the State Engineer and the City, the Court of Appeals addressed a number of issues on interlocutory appeal. *Oman,* 110 N.M. at 427, 796 P.2d at 1123.

{14} In *Oman,* the Court of Appeals determined that neither *Cartwright* nor other judicial proceedings involving water rights on the Gallinas operated as res judicata with respect to the State Engineer's challenge of the City's entitlement to a pueblo water right. *Oman,* 110 N.M. at 432–33, 796 P.2d at 1128–29. Similarly, the Court determined that the Gallinas Decree did not, by operation of res judicata, preclude the City's assertion of a pueblo water right. *Id.* at 435–36, 796 P.2d at 1131–32. In addition, the Court recognized that stare decisis required that both the Court of Appeals and the district court adhere to the pronouncements made by this Court in *Cartwright. Oman,* 110 N.M. at 433, 435, 796 P.2d at 1129, 1131. However, the Court of Appeals noted that *Cartwright* "announced only general principles" and that factual questions, such as the types of municipal uses of water subsumed within the pueblo rights doctrine, remained unresolved. *Oman,* 110 N.M. at 433–34, 796 P.2d at 1129–30. Recognizing the controversial nature of the pueblo rights doctrine, *id.* at 434, 796 P.2d at 1130, the Court of Appeals also determined that the district court could "on remand permit an adequate record to be developed so that ultimately the [S]upreme [C]ourt will be in a position to overrule *Cartwright I* if it chooses to do so." *Id.* at 435, 796 P.2d at 1131. The Court of Appeals affirmed the district court's denial of the motions for summary judgment and remanded the case to the district court for further proceedings. *Id.* at 436, 796 P.2d at 1132.

{15} On remand, the district court established a bifurcated procedure. For the question of the continued validity of the pueblo rights doctrine in New Mexico, the court allowed a tender of proof by the parties. The court allowed a similar tender on the question of the proper successor to the 1835 colonization grant. However, based on the binding precedent of *Cartwright,* the court did not make any findings with respect to the tender and did not rule on either of these issues. The court formally refused the tender but accepted it into the record for this Court's ultimate review. For the remaining issues, which focused on the scope of the City's pueblo right, the court conducted a trial on the merits. The court found after the trial that the City's pueblo water right has a priority of March 23, 1835, and, based on a stipulation entered into by the parties, includes the right to an unquantified amount of water reasonably necessary to meet the City's present and future needs. The court further found that the pueblo right applies to ordinary municipal purposes within the city limits and does not extend to industrial uses, groundwater, except as contemplated by the

doctrine adopted in *Templeton v. Pecos Valley Artesian Conservancy District,* 65 N.M. 59, 67–68, 332 P.2d 465, 470–71 (1958), reservoirs, or return flows from waste water treatment facilities. The district court noted that its judgment resolved all issues regarding the City's pueblo water right and expressly determined that there was no just reason for delay in entering final judgment as to this claim. *See* Rule 1–054(B)(1) NMRA 2003 ("[T]he court may enter a final judgment as to one or more but fewer than all of the claims only upon an express determination that there is no just reason for delay."); *State ex rel. State Eng'r v. Parker Townsend Ranch Co.,* 118 N.M. 780, 782, 887 P.2d 1247, 1249 (1994) ("[S]hould a subfile order reserve for future determination some issues contested by the state and the applicant, such as priority date, then under [Rule 1–054(B)(1)] the trial court would be required to make an express determination that there is no just reason for delay in order to make the subfile order final and appealable."). Following the district court's denial of the City's motion for new trial, both parties appealed.

## II. The Court of Appeals' Opinion and Stare Decisis

{16} In its docketing statement in the Court of Appeals, the City challenged each of the district court's findings limiting the scope of its pueblo water right. The City also challenged the admission of testimony by the State's expert witnesses and the district court's determination that there was no just reason for delay in entering final judgment.

{17} The State Engineer asserted in its appeal that the district court abused its discretion in denying the State's motion to withdraw from the stipulation with the City that the pueblo water right should be quantified as the amount of water reasonably necessary to satisfy the present and future needs of the City. The State Engineer also attacked the underlying validity of the pueblo rights doctrine. However, the State Engineer did not request that the Court of Appeals hold the pueblo rights doctrine to be invalid. On the contrary, the State Engineer recognized that, "[u]nder the doctrine of stare decisis and the holding in *Alexander v. Delgado,* 84 N.M.

717, 507 P.2d 778 (1973), the district court and [the Court of Appeals] [are] bound to recognize the pueblo water right doctrine and neither court may overrule the opinion in the *Cartwright* case." As a result, the State Engineer requested only that the Court of Appeals determine whether reasonable grounds existed for overruling *Cartwright,* without actually overruling the case, in the event that this Court decided to reevaluate the pueblo rights doctrine. In response to the City's motion to strike this portion of the State Engineer's docketing statement, the State Engineer requested that the Court of Appeals certify the appeal to this Court as an issue of substantial public interest. *See* NMSA 1978, § 34–5–14(C) (1972). The Court of Appeals denied this request.

{18} Despite the posture presented by the State Engineer, the Court of Appeals chose to address the doctrine of stare decisis and the validity of the pueblo rights doctrine in New Mexico. The Court of Appeals concluded that it could decline to follow Supreme Court authority if, in its determination, this Court would overrule its own precedent when given the opportunity. *State ex rel. Martinez,* 118 N.M. at 259, 880 P.2d at 870. The Court determined that *State v. Wilson,* 116 N.M. 793, 795, 867 P.2d 1175, 1177 (1994), in which we recognized the authority of the Court of Appeals to question uniform jury instructions that had not yet been addressed by this Court, modified the rule that the Court of Appeals must follow Supreme Court precedent, as that rule had been previously stated in *Alexander,* 84 N.M. at 718, 507 P.2d at 779. *State ex rel. Martinez,* 118 N.M. at 258–59, 880 P.2d at 869–70. The Court of Appeals appears to have interpreted language in *Wilson* discussing the history of the legal doctrine at issue in *Alexander* as limiting the application of the *Alexander* rule to issues decided by a line of Supreme Court authority. *See State ex rel. Martinez,* 118 N.M. at 259, 880 P.2d at 870 (focusing on "the recurring opportunities our Supreme Court had to reconsider the legal doctrine in *Alexander*"). In addition, the Court of Appeals relied on *Indianapolis Airport Authority v. American Airlines, Inc.,* 733 F.2d 1262, 1272 (7th Cir.1984), *disapproved on other grounds by Nw. Airlines, Inc. v. County of*

*Kent, Mich.,* 510 U.S. 355, 371, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994), in which the Seventh Circuit indicated that federal intermediate appellate courts had the authority to decline to follow precedent from the United States Supreme Court under limited circumstances. *State ex rel. Martinez,* 118 N.M. at 259, 880 P.2d at 870.

{19} Based on this analysis, the Court of Appeals declined to follow *Cartwright* because it had not been reaffirmed by this Court since it was decided in 1958 and because it had been uniformly criticized by scholars. *State ex rel. Martinez,* 118 N.M. at 259-60, 880 P.2d at 870-71. As a result, the Court of Appeals held that the City had no pueblo water right, *id.* at 265, 880 P.2d at 876, thereby making it unnecessary to address the City's claims on appeal. We then granted the City's petition for writ of certiorari to the Court of Appeals. However, at the parties request, we stayed the matter pending settlement negotiations and the adjudication of the City's other water rights. We address this case now on resubmission after a settlement could not be reached and the City's other water rights have been adjudicated.

{20} We take this opportunity to clarify that *Wilson* modified *Alexander* only to the extent that *Alexander* and its progeny prevented the Court of Appeals from reviewing uniform jury instructions that have not previously been ruled upon by this Court. We modified *Alexander* in this limited context "[i]n deference to and in recognition of the vital role the Court of Appeals serves in the New Mexico judiciary." *Aguilera v. Palm Harbor Homes, Inc.,* 2002–NMSC–029, ¶ 6, 132 N.M. 715, 54 P.3d 993. Outside this context, however, and as we recently noted in *Aguilera,* 2002–NMSC–029, ¶ 6, 132 N.M. 715, 54 P.3d 993, *Wilson* stands for the proposition that "[t]he Court of Appeals ... remains bound by Supreme Court precedent." *Wilson,* 116 N.M. at 796, 867 P.2d at 1178. As with the principle of stare decisis generally, the *Alexander* rule remains a necessity in order to protect the fundamental interests of fairness, certainty, uniformity, and judicial economy, *see Wilson,* 116 N.M. at 795-96, 867 P.2d at 1177-78, and the rule is implicit

in our power of superintending control and our power to issue writs of certiorari, *Alexander,* 84 N.M. at 718, 507 P.2d at 779.

{21} Consistent with our pronouncements in *Wilson* and *Alexander,* the principle of declining to follow precedent articulated in *Indianapolis Airport Authority* has been rejected by the United States Supreme Court. "Our decisions remain binding precedent until we see fit to reconsider them, regardless of whether subsequent cases have raised doubts about their continuing vitality." *Hohn v. United States,* 524 U.S. 236, 252–53, 118 S.Ct. 1969, 141 L.Ed.2d 242 (1998); *accord Rodriguez de Quijas v. Shearson/Am. Express, Inc.,* 490 U.S. 477, 484, 109 S.Ct. 1917, 104 L.Ed.2d 526 (1989) (rejecting an anticipatory overruling by the intermediate appellate court and stating that "[i]f a precedent of this Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions"). Contrary to its position in *Indianapolis Airport Authority,* the Seventh Circuit recently adhered to the rule announced by the Supreme Court. *Scheiber v. Dolby Labs., Inc.,* 293 F.3d 1014, 1018 (7th Cir.2002) ("[W]e have no authority to overrule a Supreme Court decision no matter how dubious its reasoning strikes us, or even how out of touch with the Supreme Court's current thinking the decision seems."), *cert. denied,* 537 U.S. 1109, 123 S.Ct. 853, 154 L.Ed.2d 781 (2003).

{22} We clarify that the operative fact for the application of the *Alexander* rule is the existence of precedent from this Court on the matter, and it is not necessary for that precedent to have been reconsidered or reaffirmed. *See Wilson,* 116 N.M. at 795, 867 P.2d at 1177 (stating that the Court of Appeals "is precluded only from overruling those instructions that have been considered by this Court in actual cases and controversies that are controlling precedent"). Moreover, the existence of scholarly criticism of one of our opinions does not diminish its binding nature as precedent. *See Nat'l Foreign Trade Council v. Natsios,* 181 F.3d 38, 58 (1st Cir.1999) ("Scholarly debate about the con-

tinuing viability of a Supreme Court opinion does not, of course, excuse the lower federal courts from applying that opinion."), *aff'd sub nom. Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 120 S.Ct. 2288, 147 L.Ed.2d 352 (2000). Nonetheless, we emphasize, as we did in *Wilson*, that while the Court of Appeals is bound by Supreme Court precedent, the Court is invited to explain any reservations it might harbor over its application of our precedent so that we will be in a more informed position to decide whether to reassess prior case law either by way of certiorari or, preferably under such circumstances, certification. *See Wilson*, 116 N.M. at 796, 867 P.2d at 1178.

{23} Considering that the State Engineer did not ask the Court of Appeals to overrule *Cartwright* and that the Court of Appeals recognized the binding nature of *Cartwright* in *Oman*, we interpret the Court of Appeals' opinion in this case as expressing reservations over the doctrine adopted in *Cartwright*. Further, we agree with the State Engineer that this Court's granting of the City's petition renders harmless any attempt by the Court of Appeals to overrule *Cartwright*. As a result, we now independently consider whether *Cartwright* remains viable authority. *Cf. Alexander*, 84 N.M. at 719, 507 P.2d at 780 ("Even though we have disapproved of the manner in which the Court of Appeals proceeded, we will nevertheless consider whether unavoidable accident ... should be abolished."). We reject the City's contention that we should not revisit *Cartwright* without an evidentiary hearing at which the State's expert witnesses may be subjected to cross-examination. *Cartwright*'s continued viability is a question of law that is properly and adequately before this Court on the present record.

## III. The Validity of the Pueblo Rights Doctrine in New Mexico

{24} The State Engineer urges us to overrule *Cartwright* and reject the pueblo rights doctrine in New Mexico for two primary reasons. First, contrary to the analysis in *Cartwright*, the State Engineer contends that there is no historical basis for the pueblo rights doctrine in Spanish and Mexi-

can law. Second, the State Engineer argues that the pueblo rights doctrine is inconsistent with fundamental precepts of New Mexico water law. We do not believe that the State Engineer's first reason provides adequate grounds to overrule *Cartwright*, but we need not take a definitive position on the historical validity of the pueblo rights doctrine because we agree with the State Engineer that *Cartwright* is based on a flawed analysis of New Mexico water law. We more fully address each of these points below. We begin, however, by reiterating the importance of stare decisis.

> Very weighty considerations underlie the principle that courts should not lightly overrule past decisions. Among these are the desirability that the law furnish a clear guide for the conduct of individuals, to enable them to plan their affairs with assurance against untoward surprise; the importance of furthering fair and expeditious adjudication by eliminating the need to relitigate every relevant proposition in every case; and the necessity of maintaining public faith in the judiciary as a source of impersonal and reasoned judgments.

*Moragne v. States Marine Lines, Inc.*, 398 U.S. 375, 403, 90 S.Ct. 1772, 26 L.Ed.2d 339 (1970). Based on the importance of stare decisis, "we require a compelling reason to overrule one of our prior cases." *Padilla v. State Farm Mut. Auto. Ins. Co.*, 2003–NMSC–011, ¶ 7, 133 N.M. 661, 68 P.3d 901. We consider the State Engineer's arguments with these principles in mind.

## A. Historical Basis for the Pueblo Rights Doctrine

{25} In the district court, the State Engineer tendered the expert opinion of several witnesses discussing the question of whether the pueblo rights doctrine is supported by historical evidence: Professor G. Emlen Hall, a legal historian, Dr. Iris Engstrand, a historian, Professor Guillermo F. Margadant, an expert in Spanish and Mexican legal history, Professor Hans W. Baade, a legal historian, and Professor Daniel Tyler, a historian. Each of these experts concluded that the pueblo rights doctrine lacks a historical foundation in the law of either of the two antecedent sovereigns in New Mexico, Spain and

Mexico. The State Engineer's experts provided examples of other towns established by colonization grants in New Mexico and Texas for which there is no evidence of a prior and paramount right to water. *See, e.g.,* Daniel Tyler, *The Mythical Pueblo Rights Doctrine* 35–44 (1990). In response to these expert opinions, the City devoted its tender on the validity of the pueblo rights doctrine to *Cartwright* and its authorities, which primarily consisted of the California cases recognizing the pueblo rights doctrine, *see Vernon Irrigation Co. v. City of Los Angeles,* 106 Cal. 237, 39 P. 762 (1895), *overruled on other grounds by Beckett v. City of Petaluma,* 171 Cal. 309, 153 P. 20, 23 (1915); *Lux,* 69 Cal. 255, 10 P. 674; *see also City of Los Angeles v. City of San Fernando,* 14 Cal.3d 199, 123 Cal.Rptr. 1, 537 P.2d 1250, 1277 (1975) (stating that *Lux* and *Vernon* "are the key decisions on the issue"), *disapproved on other grounds by City of Barstow v. Mojave Water Agency,* 23 Cal.4th 1224, 99 Cal.Rptr.2d 294, 5 P.3d 853, 867–68 (2000). Based on the scholarly criticism of the State Engineer's experts, the Court of Appeals concluded that the pueblo rights "doctrine is historically invalid." *State ex rel. Martinez,* 118 N.M. at 263, 880 P.2d at 874; *accord In re Contests of the City of Laredo to the Adjudication of Water Rights,* 675 S.W.2d 257, 259–69 (Tex. App.1984).

{26} The State Engineer contends that the pueblo rights doctrine is historically invalid. However, because this Court adopted the pueblo rights doctrine in *Cartwright,* we do not treat the issue of the historical validity of the doctrine as we would if it were an issue of first impression. Thus, the question is not whether we agree with the State Engineer's historical view of the law of antecedent sovereigns but, instead, whether this Court's historical analysis in *Cartwright* is so clearly erroneous as to create a compelling reason for overruling *Cartwright.* Having reviewed the State Engineer's tender and the authorities upon which *Cartwright* relied, we do not believe that the historical evidence is sufficiently clear to justify overruling *Cartwright* on this basis.

{27} The State Engineer's primary attack on the historical validity of the pueblo rights

doctrine is its inconsistency with the Spanish and Mexican practice of equitable apportionment and common use, as stated in the Plan of Pitic and the Recopilación. However, this Court was not unaware of this view of the law of antecedent sovereigns when adopting the pueblo rights doctrine. *See Cartwright,* 66 N.M. at 97, 343 P.2d at 676–77 (Federici, D.J., dissenting) (quoting Section 7 of the Plan of Pitic, which states in relevant part that " '[t]he residents and natives shall enjoy equally ... *water privileges ... in common with the residents and natives of the adjoining and neighboring pueblos* ' "). Moreover, the State Engineer's reliance on equitable apportionment conflicts with this Court's longstanding interpretation of water law applicable in New Mexico under Spanish and Mexican rule outside the context of the pueblo rights doctrine.

{28} Although "[t]he water in the public stream belongs to the public," *Snow v. Abalos,* 18 N.M. 681, 693, 140 P. 1044, 1048 (1914), unappropriated water is "subject to appropriation for beneficial use." N.M. Const. art. XVI, § 2. Once appropriated, "[p]riority of appropriation shall give the better right." N.M. Const. art. XVI, § 2. New Mexico water law, then, stands in contrast to the State Engineer's reliance on a theory of common use, under which reasonable use and equitable sharing would control. Although the State Engineer relies on Spanish and Mexican law in support of equitable distribution, the current system of water law in New Mexico is based on this Court's interpretation of the law of antecedent sovereigns.

In New Mexico, the "Colorado doctrine," as it is termed, of prior appropriation prevails. Established or founded by the custom of the people, it grew out of the condition of the country and the necessities of its citizens. The common-law doctrine of riparian right was not suited to an arid region, and was never recognized by the people of this jurisdiction. When the question came before the courts for adjudication[, *Albuquerque Land & Irrigation Co. v. Gutierrez,* 10 N.M. 177, 240, 61 P. 357, 360–61 (1900), *aff'd,* 188 U.S. 545, 23 S.Ct. 338, 47 L.Ed. 588 (1903)], the doctrine of prior appropriation was recognized

by the courts and became the settled law of the territory. The judicial declaration, however, did not make the law; it only recognized the law as it had been established and applied by the people, and as it had always existed from the first settlement of this portion of the country. This construction of the law by the courts has been consistently adhered to by the Legislature of the territory....

*Snow*, 18 N.M. at 693, 140 P. at 1048; *accord State ex rel. State Game Comm'n v. Red River Valley Co.*, 51 N.M. 207, 226, 182 P.2d 421, 433 (1945) (stating that prior appropriation has been applied in New Mexico "for some two or three centuries"); *United States v. Rio Grande Dam & Irrigation Co.*, 9 N.M. 292, 306, 51 P. 674, 678 (1898) ("The law of prior appropriation existed under the Mexican republic at the time of the acquisition of New Mexico ...."), *rev'd on other grounds*, 174 U.S. 690, 19 S.Ct. 770, 43 L.Ed. 1136 (1899).

{29} In fact, we have previously rejected equitable apportionment as inconsistent with New Mexico's system of prior appropriation. *Yeo v. Tweedy*, 34 N.M. 611, 286 P. 970 (1929). In *Yeo*, a landowner asserted rights to underlying groundwater by virtue of ownership of the land, either as absolute ownership of as much water as the landowner could capture or to "the right to reasonable use of such waters correlative with similar rights of other owners." *Id.* at 614, 286 P. at 971–72.

According to the "correlative rights" doctrine, each overlying owner would have the same right—the right to use whenever he [or she] saw fit. The right does not arise from an appropriation to beneficial use, which develops the resources of the state. It is not lost or impaired by nonuse. Regardless of the improvements and investments of the pioneers, later comers and later developers may claim their rights. The exercise of those rights which have been in abeyance will frequently destroy or impair existing improvements, and may so reduce the rights of all that none are longer of practical value, and that the whole district is reduced to a condition of nonproductiveness. The preventive for such unfortunate and uneconomic results is found

in the recognition of the superior rights of prior appropriators. Invested capital and improvements are thus protected. New appropriations may thus be made only from a supply not already in beneficial use. Nonuse involves forfeiture. A great natural public resource is thus both utilized and conserved.

*Id.* at 620, 286 P. at 974. We concluded that the doctrine of prior appropriation "is the rule best adapted to our condition and circumstances," *id.* at 621, 286 P. at 974, and that this rule applied in New Mexico under Spanish and Mexican sovereignty, *compare id.* at 617–18, 286 P. at 973, *with id.* at 630, 286 P. at 978 (Parker, J., dissenting on rehearing) (stating that Spanish and Mexican "civil law was the same as the common law in regard to percolating waters").

{30} Based on these authorities, we could not reject the pueblo rights doctrine through a recognition of equitable apportionment and common use without undermining the historical basis for New Mexico's adoption of the doctrine of prior appropriation as a legacy of antecedent sovereigns. In short, New Mexico does not recognize equitable distribution as the system of water law that survived the Treaty of Guadalupe Hidalgo. *But cf. Colorado v. New Mexico*, 459 U.S. 176, 183–88, 103 S.Ct. 539, 74 L.Ed.2d 348 (1982) (applying the federal common law doctrine of equitable apportionment to interstate water adjudications between prior appropriation states and rejecting priority as the sole criterion). We will not, in the limited context of the pueblo rights doctrine, reevaluate the entire historical basis for water law in this State. We thus reject the State Engineer's arguments relating to common use.

{31} Moreover, we are wary of undue reliance on scholarly opinions in re-evaluating a position previously adopted by this Court. As the record in this case demonstrates, historical opinion can fluctuate based on newly found historical evidence or novel interpretations of extant sources. Unlike history as a matter of theory, however, the law, as reflected by the doctrine of stare decisis, requires a greater degree of certainty and predictability. For example, if we were to adopt the State Engineer's historical analy-

sis, the discovery of new evidence supporting the existence of the pueblo rights doctrine in Spanish and Mexican law would remain a possibility, *see State ex rel. Martinez*, 118 N.M. at 265, 880 P.2d at 876 (Hartz, J., concurring in part and dissenting in part), which would undoubtedly lead to another dispute over the historical validity of this doctrine. For property rights in general and water rights in particular, we believe that defining these rights based on prevailing scholarship would create an intolerable degree of uncertainty. Thus, while we concede that, in light of presently available historical evidence, the pueblo rights doctrine "rests ... on a very narrow foundation," Wells A. Hutchins, *Pueblo Water Rights in the West*, 38 Tex. L.Rev. 748, 757 (1960), we are not convinced that this Court's adoption of the pueblo rights doctrine in *Cartwright* represents an entirely untenable view of Spanish and Mexican law. *See* Hans W. Baade, *The Historical Background of Texas Water Law—A Tribute to Jack Pope*, 18 St. Mary's L.J. 1, 82 (1986) ("Given the high priority of [domestic and municipal] purposes, [the pueblo water right] claim seems neither implausible nor inequitable."). As a result, we do not believe that the State Engineer's tender provides the compelling reason to overrule *Cartwright* that we demand in order to depart from stare decisis.

{32} In any event, because we conclude, as discussed in detail below, that the pueblo rights doctrine is inconsistent with New Mexico law and not protected by the Treaty of Guadalupe Hidalgo, the historical validity of the pueblo rights doctrine is irrelevant to our determination that *Cartwright* must be overruled. Regardless of whether the pueblo rights doctrine has a valid historical basis in the law of antecedent sovereigns, New Mexico water law, following the Treaty, precludes its recognition. Thus, the doctrine's inconsistency with New Mexico law forecloses any future argument that the pueblo rights doctrine exists in New Mexico irrespective of its historical validity or invalidity.

## B. The Pueblo Rights Doctrine's Relationship to General Principles of Water Law

{33} The State Engineer raises what we believe to be more vital concerns with the pueblo rights doctrine than its historical validity in the law of antecedent sovereigns. The State Engineer argues that the perpetually expanding nature of the pueblo right conflicts with the fundamental principle of beneficial use that lies at the heart of New Mexico water law. As a result, the State Engineer contends that the doctrine is incompatible with water law in New Mexico and violates public policy. We agree. While we are unwilling to second-guess the historical analysis in *Cartwright* based on the present record, we reject the notion in *Cartwright* that "nothing in the theory of Pueblo Rights [is] inconsistent with the doctrine of prior appropriation and beneficial use," 66 N.M. at 80, 343 P.2d at 665, and that the reasons supporting the "Pueblo Rights doctrine apply with as much force in New Mexico as they do in California," *id.* at 85, 343 P.2d at 668. We believe that these statements reflect a flawed analysis of New Mexico water law.

{34} In New Mexico, "[b]eneficial use shall be the basis, the measure and the limit of the right to the use of water." N.M. Const. art. XVI, § 3. We have said that this fundamental principle "is applicable to all appropriations of public waters." *State ex rel. State Eng'r v. Crider*, 78 N.M. 312, 315, 431 P.2d 45, 48 (1967). "As it is only by the application of the water to a beneficial use that the perfected right to the use is acquired, it is evident that an appropriator can only acquire a perfected right to so much water as he [or she] applies to a beneficial use." *State ex rel. Cmty. Ditches v. Tularosa Cmty. Ditch*, 19 N.M. 352, 371, 143 P. 207, 213 (1914); *accord Snow*, 18 N.M. at 694, 140 P. at 1048 ("[I]t is the application of the water, or the intent to apply, followed with due diligence toward application and ultimate application, which gives the appropriator the continued and continuous right to take the water."). The principle of beneficial use is based on "imperative necessity," *Hagerman Irrigation Co. v. McMurry*, 16 N.M. 172, 181, 113 P. 823, 825 (1911), and "aims fundamentally at definiteness and certainty." *Crider*, 78 N.M. at 315, 431 P.2d at 48 (quotation marks and quoted authority omitted). It

promotes the economical use of water, while also protecting the important interest of conservation. *See Yeo,* 34 N.M. at 620, 286 P. at 974.

> [W]ater was placed in a unique category in our Constitution—something that cannot be said of lumbering, coal mining, or any other element or industry. The reason for this is of course too apparent to require elaboration. Our entire state has only enough water to supply its most urgent needs. Water conservation and preservation is of utmost importance. Its utilization for maximum benefits is a requirement second to none, not only for progress, but for survival. Recognition of these facts, as well as a conviction that the doctrine of prior appropriation was better suited to accomplishing the desired ends than was the common law riparian doctrine must have been the principal reason for the adoption in this state of the prior appropriation doctrine as the law applicable to water.

*Kaiser Steel Corp. v. W.S. Ranch Co.,* 81 N.M. 414, 417, 467 P.2d 986, 989 (1970).

 {35} In applying these principles, we have recognized that water users have a reasonable time after an initial appropriation to put water to beneficial use, known as the doctrine of relation. *State ex rel. Reynolds v. Mendenhall,* 68 N.M. 467, 470–71, 362 P.2d 998, 1001 (1961); *Hagerman Irrigation Co.,* 16 N.M. at 180, 113 P. at 824–25. "If the application to beneficial use is made in proper time, it relates back and completes the appropriation as of the time when it was initiated." *Hagerman Irrigation Co.,* 16 N.M. at 180, 113 P. at 825. We have applied this principle to municipalities in order to allow for "normal increase in population within a reasonable period of time." *Crider,* 78 N.M. at 316, 431 P.2d at 49. In addition, a municipality may be given a more substantial "reasonable time" for its population growth than a typical water user would have to complete an appropriation. *Compare* NMSA 1978, § 72–1–9 (2003) (providing, based on public welfare and the conservation of water, that municipalities have forty years "to plan for the reasonable development and use of water resources" and that municipal water

rights can be based on "reasonably projected additional needs within forty years"), *with* NMSA 1978, § 72–5–28(A) (2002) (providing for forfeiture of water rights one year after notice of four years of nonuse). *See generally* Hutchins, *supra,* at 756 ("Preferences in the application of water are granted to municipalities in various western jurisdictions."). However, even for municipalities, if the water is not applied to beneficial use within a reasonable time, "such right may be lost." *Crider,* 78 N.M. at 316, 431 P.2d at 49.

{36} The pueblo rights doctrine is inconsistent with these principles. Under the doctrine, pueblos are not limited by the reasonable time requirement for applying water to beneficial use. Instead, the pueblo right contemplates an indefinite expansion to meet the growing demands of an increased population, regardless of how small the population of the initial pueblo and how long it takes the pueblo to expand. This aspect of the pueblo water right intolerably interferes with the goals of definiteness and certainty contemplated by prior appropriation; it envisions either the total loss of use of any amount of water the pueblo might potentially use in the future or temporary appropriations by other users subject indefinitely to elimination of their rights by possible population growth or increased needs of the pueblo. This level of uncertainty could potentially paralyze others from legitimately making beneficial use of unappropriated waters on the same stream as a pueblo out of fear of potential future interference with the pueblo's expansion. Whereas, with the doctrine of relation, other water users "are on notice that the law is granting them water rights that are temporary only" pending a reasonable time for the senior appropriator to complete the initial appropriation, there is no reasonable notice to other water users of a pueblo's potential water needs in the future because the pueblo right neither limits the quantity of water available to the municipality nor the amount of time available to complete its initial appropriation. Hutchins, *supra,* at 756 (discussing the differences between prior appropriation and the pueblo rights doctrine). Our water laws, however, are designed "to encourage use and discourage nonuse or waste." *State ex rel. Reynolds v. S. Springs Co.,* 80 N.M.

144, 148, 452 P.2d 478, 482 (1969). The pueblo rights doctrine interferes with the necessity of utilizing water for the maximum benefits.

{37} Additionally, unlike typical water rights, the pueblo right is not subject to forfeiture for nonuse. *See City of Los Angeles v. City of Glendale*, 23 Cal.2d 68, 142 P.2d 289, 293–94 (1943). Forfeiture, however, is an essential punitive tool by which "the policy of our constitution and statutes is fostered, and the waters made to do the greatest good to the greatest number." *S. Springs Co.*, 80 N.M. at 147, 452 P.2d at 481 (citations omitted). Forfeiture "prevent[s] the waste of water—our greatest natural resource." *State ex rel. Erickson v. McLean*, 62 N.M. 264, 272, 308 P.2d 983, 988 (1957). The pueblo right subverts these critical policies.

{38} By facilitating the underutilization of essential public waters, the pueblo right prevents the efficient, economic use of water that is necessary for survival in this arid region and upon which our entire system of water law is based. We therefore agree with the dissent in *Cartwright* that the ever-expanding quality of the pueblo water right "is as antithetical to the doctrine of prior appropriation as day is to night." *Cartwright*, 66 N.M. at 110, 343 P.2d at 686 (Federici, D.J., dissenting). We conclude that the pueblo rights doctrine is incompatible with New Mexico water law.

{39} Moreover, we disagree with the determination in *Cartwright* that pueblo water rights are protected by the Treaty of Guadalupe Hidalgo, at least with regard to the expanding nature of the right. As pointed out by the dissent in *Cartwright*, the Treaty did not protect inchoate rights. 66 N.M. at 113–17, 343 P.2d at 687–91 (Federici, D.J., dissenting). *See generally United States v. City of Sante Fe*, 165 U.S. 675, 713–16, 17 S.Ct. 472, 41 L.Ed. 874 (1897). To the extent that Spanish and Mexican law recognized a pueblo water right, the nature of the right that allowed increased water usage in response to growing needs of the pueblo would have been a matter of grace, not a matter of right; future expansion of water rights subsequent to the colonization grant would have

been subject to the sovereign's power of reallocation according to a change in circumstances. *See* Stevens, *supra*, at 569 ("[E]ach grant petition occasioned an official reevaluation of the adequacy of water supplies in the particular vicinity."). Thus, the expanding quality of the pueblo right, being inchoate, was not guaranteed by the Treaty. Its recognition became a matter of discretion for the new sovereign. *See City of Sante Fe*, 165 U.S. at 714, 17 S.Ct. 472 (stating that an inchoate claim "was subject to the uncontrolled discretion of congress"); *see also United States v. Sandoval*, 167 U.S. 278, 293–94, 17 S.Ct. 868, 42 L.Ed. 168 (1897) ("To the extent only that congress has vested them with authority to determine and protect such rights can courts exercise jurisdiction."). By virtue of various acts of Congress, this discretion rested with New Mexico, through its control over public waters within its boundaries. *See Cal.-Or. Power Co. v. Beaver Portland Cement Co.*, 295 U.S. 142, 154–65, 55 S.Ct. 725, 79 L.Ed. 1356 (1935); *see also Red River Valley Co.*, 51 N.M. at 224–25, 182 P.2d at 432 (stating that Congress's confirmation of Spanish or Mexican land grants did not restrict the State's regulation of public waters); *id.* at 269–74, 182 P.2d at 460–64 (on rehearing) (discussing *Cal.-Or. Power Co.*).

{40} We agree with the dissent in *Cartwright* that New Mexico has not recognized inchoate water rights granted by Mexico or Spain. *See Cartwright*, 66 N.M. at 117, 343 P.2d at 690–91 (Federici, D.J., dissenting). It is true that New Mexico has protected water rights in existence at the time of the Treaty and before the enactment of a comprehensive water code in 1907. *See* N.M. Const. art. XVI, § 1; NMSA 1978, §§ 72–1–2 (1907), –9–1 (1941). However, this protection has always been circumscribed by the principle of beneficial use and limited to vested rights. *See Tularosa Cmty. Ditch*, 19 N.M. at 371, 143 P. at 213 ("As it is only by the application of the water to a beneficial use that the perfected right to the use is acquired, it is evident that an appropriator can only acquire a perfected right to so much water as he [or she] applies to a beneficial use."); *see also* N.M. Const. art. XVI, § 1;

§ 72–9–1 ("Nothing contained in this article shall be construed to impair existing *vested* rights . . . .") (emphasis added).

> All water within the state, whether above or beneath the surface of the ground belongs to the state, which authorizes its use, and there is no ownership in the corpus of the water but the use thereof may be acquired and the basis of such acquisition is beneficial use. The state as owner of water has the right to prescribe how it may be used. This the state has done by . . . provid[ing] that the beneficial use is the basis, the measure, and limit to the right to the use of water.

*McLean,* 62 N.M. at 271, 308 P.2d at 987 (citation omitted).

{41} As discussed above, the pueblo rights doctrine is inconsistent with the principle of beneficial use. Therefore, we conclude that the expanding nature of the pueblo right is not an existing right within the meaning of Article XVI, Section 1 of the New Mexico Constitution. Jefferson E. LeCates, *Water Law—The Effect of Acts of the Sovereign on the Pueblo Rights Doctrine in New Mexico,* 8 Nat. Resources J. 727, 736 (1968) ("The effect of the provisions in the New Mexico Constitution was the cancellation of any rights to increase the amount of water to be appropriated in the future to satisfy the expanding needs of the growing pueblos."). We also believe that the pueblo rights doctrine unduly interferes with the State's regulation of water rights, *see McLean,* 62 N.M. at 272, 308 P.2d at 988 ("The State is vitally concerned in every appropriation. The need for water is imperative, and often the supply is insufficient. Such conditions lead inevitably to many serious controversies, and demand from the state an exercise of its police power, not only to ascertain rights, but also to regulate and protect them."); NMSA 1978, § 72–14–3.1 (2003) (providing for the preparation and implementation of a comprehensive state water plan), with the important interest of conservation, *see* NMSA 1978, § 72–5–5.1 (1985) (recognizing "the importance of public welfare and conservation of water in administering [the State's] public waters"), and with this State's obligations under interstate compacts, *see* NMSA 1978, §§ 72–1–2.2 (1991) (recognizing a potential shortage of water on the Pecos River and declaring the shortage and the State's obligations to Texas pursuant to compact "a statewide problem affecting all the citizens of the state"), –14–3 (1935) (delegating to the interstate stream commission the power "to investigate water supply, to develop, to conserve, to protect and to do any and all other things necessary to protect, conserve and develop the waters and stream systems of this state, interstate or otherwise"). We thus conclude that pueblo water rights are not otherwise protected by New Mexico law.

{42} The water right acquired by a municipality under a colonization grant from antecedent sovereigns is recognized in New Mexico in the same manner as other municipal water rights. The colonization grant establishes the date of priority, but the priority date applies only to the quantity of water put to beneficial use within a reasonable time of the initial appropriation. Thus, the City's 1835 colonization grant created a vested right only to the amount of water put to beneficial use within a reasonable time.[1] Any water not put to beneficial use within a reasonable time cannot be reserved by a municipality for future expansion; the unappropriated waters remaining after a reasonable time has elapsed from the initial appropriation "belong to the public and [are] subject to appropria-

---

1. We reject the State Engineer's contention that any vested water rights from the 1835 grant belong to the board of trustees established by the Legislature and not to the City. We agree with the district court that this contention was resolved in the two *Cartwright* decisions, *see Cartwright,* 68 N.M. at 420, 362 P.2d at 797–98, and we believe our resolution at that time was correct. The City has a vested right to any water put to beneficial use within a reasonable time of the 1835 grant by virtue of the Treaty of Guadalupe Hidalgo and Article XVI, Section 1 of the New Mexico Constitution. Thus, aside from the question of whether the 1903 patent issued by the United States government included water rights, *see Cartwright,* 66 N.M. at 116, 343 P.2d at 690 (on rehearing) (Federici, D.J., dissenting), and the issue of the board's authority over water rights as opposed to land interests, *see* NMSA 1978, § 49–6–9 (1903) (listing the board's powers), the Legislature's directive that the board has no power to affect vested rights, NMSA 1978, § 49–6–10 (1909), fully resolves this argument.

**390**

tion for beneficial use." N.M. Const. art. XVI, § 2.

{43} Because the expanding water right recognized by this Court in *Cartwright* directly conflicts with the doctrine of prior appropriation, we conclude that the pueblo water right is a "doctrinal anachronism," *Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833, 855, 112 S.Ct. 2791, 120 L.Ed.2d 674 (1992), and that it represents a "positive detriment to coherence and consistency in the law." *Patterson v. McLean Credit Union*, 491 U.S. 164, 173, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989). "[T]he decision poses a direct obstacle to the realization of important objectives embodied" in New Mexico water law. *Id.* As a result, we believe that there is a compelling reason to overrule *Cartwright*.

## C. The Rule of Property and Stare Decisis

■ {44} Despite the existence of adequate grounds to overrule *Cartwright*, the City contends that we should nonetheless adhere to stare decisis because *Cartwright* established a rule of property that induced substantial detrimental reliance. We have said that precedent establishing property rights "should not be disturbed or departed from except for the most cogent reasons, certainly not because of doubts as to their soundness." *Duncan v. Brown*, 18 N.M. 579, 585, 139 P. 140, 141 (1914). We have applied this principle in the context of judicial pronouncements relating to water rights. *See State ex rel. Bliss v. Dority*, 55 N.M. 12, 31, 225 P.2d 1007, 1019 (1950).

> The especial importance of stare decisis in cases involving a rule of property is twofold. First, and more generally, the anti-majoritarian nature of the judicial system makes adherence to precedent essential to promote public confidence in the law and its administration. Second, and more specific to rules affecting property or commercial transactions, adherence to precedent is necessary to the stability of land titles and commercial transactions entered into in reliance on the settled nature of the law.

*Bogle Farms, Inc. v. Baca*, 1996–NMSC–051, ¶ 30, 122 N.M. 422, 925 P.2d 1184 (citation omitted). In determining whether to defer to a rule of property, we assess the extent to which the rule announced in prior cases has become fixed or settled and the extent to which it has "induced persons to enter into transactions in actual or demonstrable reliance thereon." *Id.* ¶ 31.

{45} We reject the City's argument that *Cartwright* should be upheld as a rule of property. Regardless of whether the pueblo rights doctrine could be viewed as a settled, fixed, and stable principle, we conclude, based on the doctrine's inconsistency with the goals of prior appropriation, that "the evils of the principle laid down will be more injurious to the community than can possibly result from a change." *Bogle Farms*, 1996–NMSC–051, ¶ 29, 122 N.M. 422, 925 P.2d 1184 (quoted authority omitted). This conclusion is influenced by the fact that *Cartwright* was not a general stream adjudication and the State Engineer, who exercises "general supervision of waters of the state and of the measurement, appropriation, [and] distribution thereof," NMSA 1978, § 72–2–1 (1982), was not a party. *Cf. Bogle Farms*, 1996–NMSC–051, ¶ 32, 122 N.M. 422, 925 P.2d 1184 (noting that "there is a public-interest aspect to rejection of stare decisis").

{46} In addition, we are not convinced that *Cartwright* induced the type of reliance that is contemplated by the rule of property. *Cartwright* concerned the nature of a water right that had been granted by antecedent sovereigns. Necessarily, then, all pueblo water rights implicated by *Cartwright* had to be in existence at the time it was decided, and there could be no issuance of new pueblo water rights based on *Cartwright*. Because, under *Cartwright*, pueblo water rights could not be sold or transferred by the municipalities possessing them, *see Cartwright*, 66 N.M. at 86, 343 P.2d at 669, New Mexico's recognition of the pueblo rights doctrine could not have induced new water rights transactions, by either municipalities or other water users. While municipalities, including the City, may have expended resources to capture additional water based on this Court's decision in *Cartwright*, we do not believe that this type of reliance implicates the rule of property. Instead, we believe that the rule of property is designed to pro-

tect "the stability of land titles and commercial transactions entered into in reliance on the settled nature of the law." *Bogle Farms,* 1996–NMSC–051, ¶ 30, 122 N.M. 422, 925 P.2d 1184; *accord Duncan,* 18 N.M. at 585, 139 P. at 141 (stating that the rule of property applies to judicial decisions "affecting title to real estate presumptively acquired in reliance upon such decisions"); *see Dority,* 55 N.M. at 31, 225 P.2d at 1019 ("In the nineteen years since [an earlier] decision it may be assumed that many thousands of acres . . . have been sold to purchasers who relied on that decision as determining title to the right to use the water here involved. . . .").

{47} Moreover, we note that overruling *Cartwright* would not completely deprive the City of its water rights under the colonization grant. *Cf. Bogle Farms,* 1996–NMSC–051, ¶ 32, 122 N.M. 422, 925 P.2d 1184 (discussing the consideration of whether overruling precedent would "deprive anyone of title entirely"). Under the doctrine of prior appropriation, the City's 1835 colonization grant created a vested water right to as much water as the pueblo put to beneficial use within a reasonable time of the initial appropriation, assuming an ability to prove such use.[2] For these reasons, we reject the City's reliance on the rule of property. *Cartwright* is hereby overruled.

## IV. Prospectivity, Reliance Interests of the City, and the Proper Administration of Justice

{48} The City argues that we should apply our overruling of *Cartwright* only prospectively. While we disagree that our rejection of the pueblo rights doctrine should be given prospective application as a general matter, we agree with the City that its reliance interests are substantial. Therefore, as discussed further below, we hold that our overruling of *Cartwright* shall be given a limited prospective application with respect to the City. We hold that the City does not

possess a pueblo water right, but we remand to the district court to determine the most appropriate equitable remedy that will balance the City's reliance on *Cartwright* with other water users' reliance on New Mexico's system of prior appropriation.

{49} We begin our prospectivity analysis by restating that there is "a presumption that a new rule adopted by a judicial decision in a civil case will operate retroactively." *Beavers v. Johnson Controls World Servs., Inc.,* 118 N.M. 391, 398, 881 P.2d 1376, 1383 (1994). Retroactive application of a ruling in a civil case means that the new rule of law applies to all cases not finally determined, including the case in which the new rule is adopted, regardless of whether the events in question occurred after or before the ruling is announced. *Id.* at 397 n. 7, 881 P.2d at 1382 n. 7. In the present case, a retroactive application of our rejection of the pueblo water rights doctrine would mean that no municipality in New Mexico would be entitled to claim a pueblo water right, and it would invalidate municipal appropriations of water premised on the expanding nature of the pueblo right rather than on rights properly acquired through prior appropriation. As applied to the City, its water rights from the 1835 colonization grant would be limited to the amount of water put to beneficial use within a reasonable time of its first appropriation, which has been determined in a separate proceeding.

{50} However, "[i]t is within the inherent power of a state's highest court to give a decision prospective or retrospective application without offending constitutional principles." *Lopez v. Maez,* 98 N.M. 625, 632, 651 P.2d 1269, 1276 (1982). A ruling can be selectively prospective, under which the ruling applies to the litigants in the case adopting the new rule but otherwise only to conduct occurring after the announcement of the new rule, or purely prospective, under

2. We recognize that in the separate proceeding that occurred while the present appeal was stayed the district court found that the City was unable to prove a quantifiable appropriation stemming from its 1835 colonization grant. Nonetheless, for purposes of the rule of property, the question is whether the overruling of precedent, and not a party's failure of proof, entirely deprives a party of title to the property. Even with our overruling of *Cartwright,* the City had the opportunity to demonstrate a water right from its colonization grant through the doctrine of prior appropriation.

which it applies exclusively to conduct occurring after the announcement of the rule such that it does not apply to the litigants in the case adopting the new rule. *Beavers,* 118 N.M. at 397 n. 7, 881 P.2d at 1382 n. 7. "Pure prospectivity is rare...." *Id.* Because the City wishes to be exempted from our overruling of *Cartwright,* it presumably requests a purely prospective ruling.

{51} We note that the doctrine of prospectivity applies somewhat awkwardly to the rule of law at issue in this case. We have determined that the pueblo rights doctrine did not survive the Treaty of Guadalupe Hidalgo and is not recognized by New Mexico water law. This determination concerns events that occurred, documents that were issued, and laws that were promulgated only in the past and which are thus not readily susceptible to a prospectivity analysis. There will be no future grants of water rights to which our ruling could apply; our decision would be a nullity if it did not apply to existing pueblo grants. Presumably, the City's prospectivity argument refers not to our interpretation of the water right contained in its colonization grant but to the City's appropriations of water over time. We assume that the City requests that we only apply our ruling either to amounts of water that it has not yet put to beneficial use, thereby upholding the City's current water usage, or to future appropriations that exceed its rights acquired through prior appropriation, thereby insulating over-appropriations occurring before the announcement of our judgment.

{52} We consider three factors in determining whether a ruling should receive prospective application: (1) whether the ruling announces a new principle of law; (2) whether retroactive application will advance or hinder the purposes of the new rule; and (3) whether prospective application of the new rule is necessary to avoid an injustice or hardship due to the substantial inequity that would result from retroactive application. *Beavers,* 118 N.M. at 398, 881 P.2d at 1383. The presumption of retroactivity "may be overcome by a sufficiently weighty combination of one or more" of these factors. *Id.*

{53} Our decision in this case clearly announces a new rule of law because we are overruling our clear past precedent adopting the pueblo rights doctrine. In addition, our recognition of the pueblo rights doctrine was likely to induce reliance in the area of commercial transactions, particularly in a municipality's costs in acquisition of water and in the promotion of new development. "The reliance interest to be protected by a holding of nonretroactivity is strongest in commercial settings, in which rules of contract and property law may underlie the negotiations between or among parties to a transaction." *Beavers,* 118 N.M. at 399, 881 P.2d at 1384. The first factor in our analysis thus weighs in favor of prospectivity.

{54} However, we believe the second factor weighs, at least slightly, in favor of retroactivity. The pueblo rights doctrine is inconsistent with the doctrine of prior appropriation in a number of ways. A prospective application of our ruling would not necessarily conflict with some aspects of prior appropriation, such as certainty and beneficial use, because the current beneficial use of water can be determined for municipalities that would have had pueblo water rights under *Cartwright.* Other aspects of New Mexico water law, however, would be frustrated by prospective application of our ruling. In particular, the State has continually placed considerable reliance on the doctrine of prior appropriation, both in the State Engineer's regulation of water and in the State's various obligations under interstate compacts. This reliance preceded *Cartwright* and was necessarily based on priorities in existence at the time, without reference to possible future expansion by successors to colonization pueblos. Similarly, numerous water users have expended considerable resources in reliance on the doctrine of prior appropriation by making beneficial use of what had appeared to be unappropriated water prior to our ruling in *Cartwright. See Yeo,* 34 N.M. at 618, 286 P. at 973 ("Persons contemplating investment in lands might well have considered that in the public policy of this state water is regarded as essential to existence and progress, and that, where waters were to be found in bodies sufficient to influence

agricultural development, the right to their use would be worked out along lines consistent with former declared policy, the encouragement of use, and the discouragement of nonuse or waste."). Thus, if we were to acquiesce in the current water usage by successors to colonization pueblos through a prospective ruling, we would be causing considerable harm to those who, as we have determined, properly and reasonably relied on prior appropriation. As a result, we believe that the purposes of our rejection of the pueblo rights doctrine would be hindered by a prospective ruling.

{55} For similar reasons, we believe that the third factor, the inequity of retroactivity, is either neutral or only slightly in favor of prospectivity. The City argues that it "has relied on its Pueblo water right in planning, constructing, and operating its water system for decades." We do not doubt that successors to colonization pueblo grants may have relied on *Cartwright* to a certain extent in appropriations made since 1958, when this Court decided *Cartwright.* However, we believe that the potential inequity that retroactive application would cause from this reliance is no greater than the inequity that a prospective ruling would cause to those who relied on the doctrine of prior appropriation for an even longer period of time before our decision in *Cartwright.*

{56} Additionally, we note that *Cartwright* considered the pueblo rights doctrine in a limited context. *Cartwright* concerned a trespass action brought by numerous water users. 66 N.M. at 66, 343 P.2d at 655. The nature of the action required the Court to determine only whether the City's use of water at the time the action was filed violated the plaintiffs' water rights. Therefore, it was not necessary for the resolution of the claim to reach the issue of the future expansion of the City's water rights. This Court adopted the pueblo rights doctrine outside the context of a general stream adjudication and without the State Engineer involved as a party. Based on the State Engineer's participation in *Cartwright* as an amicus, municipalities claiming a pueblo water right had notice of the State Engineer's opposition to the pueblo rights doctrine and the likelihood

that the pueblo rights doctrine would be contested in future proceedings. These considerations diminish the reliance interests of successors to colonization pueblos with respect to the expanding nature of the pueblo water right. We conclude that the City has failed to fully overcome the presumption of retroactivity.

{57} Nevertheless, this case presents a rather unique circumstance. We recognize, as did the dissent in the Court of Appeals, that "Las Vegas is the one community in the state to have the benefit of a Supreme Court pronouncement that it possesses a pueblo right." *State ex rel. Martinez,* 118 N.M. at 265, 880 P.2d at 876 (Hartz, J., concurring in part, dissenting in part). We have also held explicitly that the plaintiffs in *Cartwright* are precluded by res judicata from relitigating their claims of trespass against the City. *Cartwright,* 68 N.M. at 419–21, 362 P.2d at 796–98. In addition, applying our holding in the present case to invalidate appropriations by the City of the same amount of water used before *Cartwright* would result in inconsistent judgments, which the judiciary strives to prevent. This anomalous situation is an unfortunate product of the different actions available to determine water rights in New Mexico.

{58} Typically, "[i]n any suit for the determination of a right to use the waters of any stream system, all those whose claim to the use of such waters are of record and all other claimants, so far as they can be ascertained, with reasonable diligence, shall be made parties." NMSA 1978, § 72–4–17 (1965). This system of general stream adjudications is designed to avoid piecemeal litigation. *See Elephant Butte Irrigation Dist. v. Regents of N.M. State Univ.,* 115 N.M. 229, 233–34, 849 P.2d 372, 376–77 (Ct.App.1993). "A comprehensive adjudication of water rights is highly important.... Waters cannot be apportioned according to conflicting decrees or decrees covering less than all claims." *El Paso & Rock Island Ry. Co. v. Dist. Ct. of Fifth Judicial Dist.,* 36 N.M. 94, 100, 8 P.2d 1064, 1067 (1931). In such an adjudication, the State Engineer furnishes the court with "a complete hydrographic survey of such stream system ... in order to obtain all data neces-

sary to the determination of the rights involved." Section 72–4–17. The adjudication may be initiated by the Attorney General, at the request of the State Engineer, NMSA 1978, § 72–4–15 (1907), or by private claimants, but in either case, all water users whose rights may be affected must be joined. *See State ex rel. Reynolds v. W.S. Ranch Co.*, 69 N.M. 169, 173–75, 364 P.2d 1036, 1039–40 (1961). The State Engineer has a regulatory interest in the litigation. *Elephant Butte*, 115 N.M. at 238, 849 P.2d at 381.

{59} Although Section 72–4–17 has been described as " 'all-embracing,' " *State ex rel. Reynolds v. Sharp*, 66 N.M. 192, 194, 344 P.2d 943, 944 (1959) (quoting *El Paso & Rock Island Ry.*, 36 N.M. at 95, 8 P.2d at 1065), it does not preclude trespass actions between individual water users under certain circumstances. *Chavez v. Gutierrez*, 54 N.M. 76, 82, 213 P.2d 597, 601 (1950) ("To say the least, [the requirement of initiating a general stream adjudication] would impose an insuperable burden on one seeking to restrain a simple trespass."). However, a simple trespass claim cannot be initiated while a general stream adjudication is pending and cannot be used to challenge the results of a general stream adjudication in which the litigants to the trespass action had participated as parties. *El Paso & Rock Island Ry.*, 36 N.M. at 100, 8 P.2d at 1068 ("To have [a water right] upheld in the adjudication suit would be useless if it can be invalidated in the injunction suit.... [The] intended benefits of general adjudication are illusory if the results are open elsewhere to attack."). In addition, in order to avoid a conflict with Section 72–4–17 and to protect the legislative purpose of comprehensive stream adjudication, a trespass claim should not be entertained if it necessarily requires the determination of the rights of other water users who are not joined in the action. *See W.S. Ranch Co.*, 69 N.M. at 174–75, 364 P.2d at 1039–40; *see also La Madera Cmty. Ditch Assoc. v. Sandia Peak Ski Co.*, 119 N.M. 591, 593, 893 P.2d 487, 489 (Ct.App. 1995) ("Here, ... La Madera seeks to determine the water rights only of the parties to the lawsuit, not those of third parties.").

{60} In light of these principles, *Cartwright* seems somewhat unusual. Although it dealt with a trespass action, it was instituted by numerous water users, approximately one hundred, on the Gallinas attempting to enforce their rights under the Hope Decree. Once it was determined that the Hope Decree was not binding on the City, the resolution of the trespass claim would not necessarily have been inconsistent with the system of general stream adjudication. However, the City's affirmative defense of the pueblo rights doctrine potentially implicated the water rights of virtually every water user on the Gallinas.

{61} We have on another occasion precluded the consideration of a claimed pueblo water right, in part because only the municipality and the State Engineer were parties to the action. *See City of Albuquerque v. Reynolds*, 71 N.M. 428, 433–34, 379 P.2d 73, 76–77 (1962); *see also La Madera Cmty. Ditch*, 119 N.M. at 593, 893 P.2d at 489 ("La Madera does not claim that it has a prior and paramount right to use the water in the La Madera stream system to the exclusion of all other appropriators."). In addition, we have required the State Engineer to join all affected water users when seeking an injunction against a water user for diverting water in violation of established water rights. *W.S. Ranch Co.*, 69 N.M. at 173–75, 364 P.2d at 1039–40.

> If [the state engineer] alone can maintain this action under his claimed supervisory authority it is conceivable that the state engineer might secure an order enjoining appellee from applying the water to its lands, but that appellee, in a separate action, might be adjudged a right by prescription against the claimants below the reservoir. A judgment between the parties to this action would not be res judicata between appellee and the lower water right claimants. Appellee could then be in the untenable position of having a judgment in one case decreeing it the water right it claims and in another case a judgment enjoining and prohibiting it from using the very water it has been decreed.

*Id.* at 173–74, 364 P.2d at 1039.

{62} In the present case, retroactive application of our holding would place the City in just such an "untenable position." *Id.* Based

on the principles outlined above, we believe that the consideration of the pueblo rights doctrine in *Cartwright* potentially conflicted with the legislative scheme established by Section 72–4–17 and, especially considering that the State Engineer did not intervene as a party, was perhaps improvident. *Cf. W.S. Ranch Co.*, 69 N.M. at 175, 364 P.2d at 1040 ("A determination of [the] legal question [of whether a water right can be acquired by prescription,] ... requires the presence of all persons who would be affected by the question being resolved."). The present action initiated by the State Engineer "well illustrates the unfortunate results which might follow a divided jurisdiction" in water rights cases. *El Paso & Rock Island Ry.*, 36 N.M. at 100, 8 P.2d at 1068. Nonetheless, having resolved the trespass claim in *Cartwright* on the merits, the parties, as between themselves, were entitled to rely on the holding that the City's water usage at the time the action was filed did not infringe on the water rights of the plaintiffs. In other words, the City had from this Court an adjudication indicating, at the very least, that it had a prior right to the water it was using in 1955, when the plaintiffs filed their claim in *Cartwright*. *See Whenry v. Whenry*, 98 N.M. 737, 740, 652 P.2d 1188, 1191 (1982) ("To permit and in fact encourage the relitigation of property interests long after the issues were supposedly settled would merely serve to reopen old wounds and create new ones."). In addition, the fact that the plaintiffs in *Cartwright* and their successors are precluded by res judicata from challenging this determination creates difficulties in enforcement if we were to apply our holding in the present case retroactively against the City, particularly since the State Engineer must join all affected parties if seeking an injunction against the City. The water users, including the City and the plaintiffs in *Cartwright*, "are the real parties in interest, insofar as the controversy between them is concerned." *W.S. Ranch Co.*, 69 N.M. at 175, 364 P.2d at 1040.

{63} To resolve this predicament, we believe that it is appropriate to exercise our discretion to apply our overruling of *Cartwright* on a limited prospective basis with respect to the City. We hold that the City can no longer claim a pueblo water right that expands indefinitely to meet growing needs. However, to reflect the City's reasonable reliance on *Cartwright*, and to ameliorate the potentially harsh impacts to the City of a purely retroactive application of our holding, we believe that an equitable remedy is appropriate. The appropriate equitable remedy will balance the reasonable reliance interests of the City with the interests of other appropriators along the Gallinas.

{64} In *Cartwright*, we declared that the City had a senior right to appropriate all the water of the Gallinas reasonably necessary to meet its growing needs. We now overrule the aspect of this holding that recognizes an expandable water right, but we do not decide whether the narrower holding that the City has a senior right to the amount of water it was applying to beneficial use in 1955 remains viable. Under a balancing of interests, it may be just to recognize an equitable right on the part of the City to this amount. This remedy would avoid inconsistent judgments and protect the City's reliance interests while still negating the expandable right recognized in *Cartwright*. Alternatively, a more appropriate remedy might be to require the City to exercise its right of condemnation for necessary amounts of water exceeding its adjudicated rights, consistent with NMSA 1978, § 3–27–2 (1994), but to allow the City to pay less than present-day market value for those rights, either based on the value of the water rights at the time we decided *Cartwright* or the time of initial appropriation by the City or based on some other equitable calculation. This more restricted equitable remedy would ensure that the City not be placed in a worse position than it would have been in had this Court ruled in favor of the trespass claimants in *Cartwright*. However, we do not believe that it would be appropriate for this Court to resolve the issue of an equitable remedy on the present record.

{65} The record before us is not sufficiently developed to allow us to fully consider all of the factors, and multiple points of view, relevant to an equitable remedy. These factors include the reliance interests of the City, the interests of other appropriators, and the

effect of the remedy on the State Engineer's regulatory responsibilities. We believe the district court is better situated to consider these matters in the first instance. As a result, we order a remand to determine the appropriate equitable remedy following a balancing of these interests. The participation of the parties and, consistent with Section 72–4–17, other affected appropriators will provide the district court with necessary information regarding the benefits and detriments of particular equitable solutions. We authorize, but do not require, an evidentiary hearing on this question. We also note that a remand will permit the parties the opportunity to resume settlement discussions with the understanding that the pueblo rights doctrine no longer exists in New Mexico.

{66} To further define the framework of our remand, we clarify that the equitable remedy issued by the district court will remain distinct from any other appropriative rights established in collateral adjudicative proceedings, including the amounts and priorities established in the Hope Decree. The equitable remedy achieved on remand will be based on the narrow scope of the *Cartwright* litigation itself, which was a trespass action, and our declaration that the City had a senior right to the amount of water appropriated in 1955, subject to indefinite expansion to meet the City's growing needs. Thus, the remedy will focus solely upon the City's interests in light of *Cartwright,* balanced with other interests within the Gallinas watershed. We instruct the district court to consider the reliance interests of the City, such as investments incurred or lost opportunities for acquiring water rights as a result of the City's reliance on its pueblo water right. However, we do not foreclose equitable relief in the event that the City is unable to demonstrate specific reliance on *Cartwright* independent of its separate adjudicated rights. As stated above, we believe that it is without question that the City relied on *Cartwright* to a certain degree. As a result, we believe that a showing of reliance is merely one factor for the district court to weigh in determining an appropriate equitable remedy. The district court should also attempt to minimize any detrimental impact on other water users, protect the State Engineer's regulatory in-

terests, and secure any constitutional interests in adjudicated property rights. Finally, the district court should strive to protect the proper administration of justice by avoiding inconsistent judgments. *See Whenry,* 98 N.M. at 740, 652 P.2d at 1191.

{67} As part of our equitable remedy, we preclude any trespass claims against the City for appropriating more than its adjudicated rights between *Cartwright* and the date this opinion is filed. Expanded appropriations during this time were authorized by our opinion in *Cartwright* and thus cannot be said to be an unlawful intrusion into the rights of other water users.

{68} We emphasize that any equitable remedy issued by the district court will be based on this Court's inherent power to apply our overruling of *Cartwright* prospectively. The equitable remedy will be independent of water rights on the Gallinas that have been previously adjudicated and thus will not affect any parallel proceedings between the parties in this case concerning the City's adjudicative rights.

## V. Conclusion

{69} We overrule *Cartwright* and hold that New Mexico does not recognize the pueblo rights doctrine. Water rights contained in colonization grants from antecedent sovereigns are limited by the principle of beneficial use and are to be quantified by the amount of water put to beneficial use by the pueblo within a reasonable time of the first appropriation. This holding is to be applied retroactively. However, in the interests of the proper administration of justice, we apply a limited prospective application of our overruling of *Cartwright* to the City. We remand this case to the district court to determine the specific aspects of the equitable remedy that would strike an appropriate balance between the reliance interests of the City, the reliance interests of other water users, and the regulatory interests of the State Engineer.

{70} **IT IS SO ORDERED.**

WE CONCUR: PETRA JIMENEZ MAES, Chief Justice, RICHARD C. BOSSON, and EDWARD L. CHÁVEZ, Justices.