308 P.2d 983

The STATE of New Mexico on the relation of John R. ERICKSON, State Engineer, Plaintiff-Appellant,

v.

Joe P. McLEAN, Defendant-Appellee.
No. 6095.

Supreme Court of New Mexico.
Jan. 28, 1957.

Rehearing Denied April 3, 1957.

Richard H. Robinson, Atty. Gen., Charles D. Harris, Spec. Asst. Atty. Gen., Jack L. Love, Spec. Asst. Atty. Gen., for appellant.

G. T. Watts, Roswell, for appellee.

LUJAN, Chief Justice.

Plaintiff as appellant before this court instituted this action in the district court for Chaves County alleging therein that the defendant was illegally irrigating certain land situated in said county from an ar-

tesian well in the Roswell Artesian Basin, and praying for injunctive relief.

The defendant by his answer denied all the material allegations of the complaint and the issues so drawn were whether a valid right existed in the defendant to irrigate the land in question and whether he was applying the said water to a beneficial use.

The case was tried to the court without a jury and at the conclusion of all of the evidence the court resolved the issues in favor of the defendant and entered judgment accordingly. Plaintiff appeals therefrom.

The court among other things, found:

"4. That all of the lands described in Plaintiff's complaint were watered from waters of the artesian basin on and prior to 1931.

"5. That the underground waters of the artesian basin were beneficially applied to all of said lands on and prior to August 21, 1931.

"6. That the source of the water supply from which said lands were beneficially irrigated was derived from a certain artesian well located on approximately the common section line between Section 27 and Section 34, Township 9 South, Range 24 East, designated as RA–226 in the office of the State Engineer of the State of New Mexico.

"8. That there has not been a period of four successive years subsequent to 1931, that any of the lands described in plaintiff's complaint have not been beneficially irrigated from waters derived from the Roswell Artesian Underground Basin.

"10. That the Office of the State Engineer of the State of New Mexico had knowledge by and through its underground water supervisors of the use to which said waters were being applied, and no action was taken by the Office of the State Engineer with relation to its said use and application until just prior to the commencement of this action."

The evidence in the record wholly fails to sustain findings Nos. 5, 6 and 8, insofar as they relate to the beneficial use of the water in question.

The issues of fact revolve around the nature and extent of artesian water used upon defendant's land. Said use prior to 1940 is shown as follows:

Oscar White, testifying for the defendant stated substantially as follows: That he had known the land for 55 or more years; that a man by the name of Brown was in possession of the land in question and that he ran the water away from the well down a ditch and it scattered out for his horses; that he was pretty sure that the old ditches were still visible twelve

years ago; that he could not say how many acres were watered from the overflow of the well. When asked to give his best judgment, he said there must have been 250 to 300 acres. On cross-examination he stated:

"There has not been any land cultivated around the Brown well for a long time. In 1925 it showed very plainly some cultivation but began to have grass to grow around on the land."

He further testified that the well was used to make fresh water for the horses and that Brown used the well to irrigate the grass for his horses in the dry years but that he did not know how much land was irrigated.

Buck Spurrier testified substantially as follows: That he had lived in Roswell since about 1925 and that he was familiar with the land in question; that the well flowed in the winter time but that he did not see any farming until Mr. Deering came back; that he could not state the number of acres over which the water was flowing; that he did observe some old ditches on the land and that the water flowed for ten to twelve years in the winter time after he came to this country in 1925; that he did not ever see the well flowing in the summertime, nor did he ever see a pump on it, nor did he ever see any of the land cultivated; that there were no valves on the well and that

he never saw anyone directing the flow of the well, nor did he see any irrigators.

In discussing the beneficial use of applying water to salt grass, he stated that it would be best to graze salt grass in the spring when it was young and that salt grass does not grow in the wintertime; and that he did not consider irrigation of salt grass would be an efficient use of water.

On cross-examination he stated that if it did not cost anything to produce the water and it was flowing freely, it would be profitable to water the grass at that time. He also stated that there was sacaton or tubra grass growing in that area.

Miles Wiggins testified substantially as follows: That he had moved in 1919 to the farm adjacent to the land in controversy; that he was acquainted with the well; that as far as he knew, he did not remember anybody farming that place right at that time but it was a flowing well and that the water was flowing out; and that as far as he knew, it was just running out on the grass; and that he did not know how much of the area was covered with the water but knew that the water was running all over the place.

Joseph M. Day testified that he became acquainted with the well in 1925 and 1926; that in 1926 or 1928 he saw a hole in the casing and water was running out of the hole; that there was no way that the water

could be cut off, although he seemed to recall that there was a gatehead on top of the casing.

A. C. Stowall testified substantially as follows: That he first became acquainted with the land in question in 1930, that he went on the land sometime in the fall and that he did not think the well was flowing at that time; that after 1930 it flowed every year as it flooded the country around it and people would have to go around it; that Mr. Deering put a pump on the well that controlled the flow to where it did not flow wild any more.

Mr. Harvey L. Deering testified that he leased the place in 1930 and bought the land in 1933; that the water would only flow in the fall and spring and that in 1933 he started to spread the water over the grass; that he had discussed the validity of the water right with an attorney who is now deceased; that said attorney stated that he would go into partnership with him if he would put in a shallow well and put in more land; that he decided not to go into partnership with the attorney; that the water started flowing in October and ran until about April and made a marsh on the land to such an extent that he and his wife would stick and have a time getting out; that water would stand over it for days at a time; that until 1940 there was no valve on the well and there was a big hole in the casing where it had rotted out.

The history of the land and well subsequent to 1940 was given by the defense witnesses Mr. Deering and Mr. Joe P. McLean and by evidence offered by the plaintiff. Mr. Deering testified that in 1940, he put a pump on the well and plowed up approximately 45 acres during that year and that he continued to let the water, run out on the grass.

Joe P. McLean testified that he did not know how many acres he had dried up and changed to other locations but that he had made some changes in the land on which water was applied; that he had purchased the land on November 18, 1948 and that since that time he had allowed the water to flow from the well over the grass east and south of the well; that he had completed or drilled two wells on the land in question in 1949, and had drilled them without a permit; that he understood it was all in the deal and that nobody had to have a permit.

E. G. Minton, Jr., the ground water supervisor testified that he had gone upon the lands in question first in 1940; that the entire tract was in native grass; that there was no land that showed any indication of having ever been farmed even though he made a thorough investigation of Sections 26, 27, 34 and 35, Township 9 South, Range 24 East; that on June 12, 1940 he wrote Mr. Deering telling him that a personal inspection of the land owned by him in the north half of Section 35 revealed that approxi-

mately 25 acres of grazing land had been plowed and was in cultivation; that on June 29, 1940, Mr. Deering purchased 10 acres of water right and made application to move them to the NW¼ of Section 35, Township 9 South, Range 24 East, to be irrigated from well M–19 and that said application was approved by the State Engineer; that at the time the application was approved well M–19 was designated RA–226; and that the conditions of the approval for the permit to change place of use read in part as follows:

" * * * and further provided: All rules and regulations of the State Engineer pertaining to the drilling of wells be complied with, and 'That no increase of use of artesian water be made other than the 30 acre feet per annum, fixed as the duty of water, on the 10 acres above described.' "

Mr. Minton further testified that on April 26, 1941, he wrote Mr. Deering and advised him that he was irrigating approximately 45.5 acres of land and that his application was approved for only 10 acres and that he had exceeded the permitted use by 35.5 acres.

Under points one, two and three, the plaintiff argues (1) that artesian water rights are forfeited by failure to apply same to beneficial use for four consecutive years; (2) that the water from the artesian well in question was allowed to waste and to discharge unnecessarily upon the surface of the ground by means of a leaky casing, lack of effective valve to control the flow, and lack of a constructed irrigation system without the constant supervision of the person using the water for more than four consecutive years between 1919 and 1940; and (3) that the use of water which constitutes waste and is contrary to law is not beneficial use.

In the trial of such issues it is important to observe that, no matter how early a person's priority of appropriation may be, he is not entitled to receive more water than is necessary for his actual use. An excessive diversion of water, through waste, cannot be regarded as a diversion to beneficial use, within the meaning of the Constitution. Article 16, §§ 1, 2 and 3, and § 75–11–2 of 1953 Compilation. Water, in this state, is too scarce, and consequently too precious, to admit waste.

The law contemplates an economical use of artesian water. It will not countenance the diversion of a volume from an artesian well which, by reason of waste resulting from permitting it to run uncontrolled for twenty four hours a day over grazing lands without an irrigation system, or through pipes to water troughs fitted with float feeds or other means of control to prevent waste therefrom, is many times that which is actually consumed for a useful or beneficial use. Water is too

valuable to be wasted, either through an extravagant application for the purpose appropriated or by waste by misapplication which can be avoided by the exercise of a reasonable degree of care to prevent loss, or loss of a volume which is greatly disproportionate to that actually consumed.

■■ The amount of water which has been applied to a beneficial use is, of course, a measure of the quantity of the appropriation. Waste of water must not be practiced. Wasteful methods, so common among the early settlers do not establish a vested right to their continuance. Such methods were only deemed a privilege, "permitted merely because it could be exercised without substantial injury to any one." Hough v. Porter, 51 Or. 318, 95 P. 732, 98 P. 1083, 1102, 102 P. 728. The use must not only be beneficial to the lands of the appropriator, but it must also be reasonable in relation.

■■ All water within the state, whether above or beneath the surface of the ground belongs to the state, which authorizes its use, and there is no ownership in the corpus of the water but the use thereof may be acquired and the basis of such acquisition is beneficial use. §§ 75–5–1 and 75–11–1. The state as owner of water has the right to prescribe how it may be used. This the state has done by the enactment of § 75–11–2, which provides that the beneficial use is the basis, the measure and limit to the right to the use of water. The Legislature has also power to provide that the right to use of water would be lost and forfeited by four years of continuous non-beneficial use. § 75–11–8.

We do not want to be understood as holding that public waters cannot be beneficially used for irrigating native grass, but we do hold that the method employed by defendant in watering the grass on his land, as well as his livestock, cannot be considered as being beneficially used within the meaning of our Constitution and laws of this State.

In Kinney on Irrigation and Water Rights, Vol. 2 (2d Ed.) p. 2020, § 1118, it is said:

"Water rights * * *, may be lost by forfeiture. Although the terms 'abandonment' and 'forfeiture' are oftentimes used interchangeably, even by the courts, upon the subject of the loss of water rights, and other rights used in connection therewith, there is a decided distinction in their legal significance, and one which, in view of the forfeiture clauses enacted by recent legislation, should be observed. While, upon the one hand, abandonment is the relinquishment of the right by the owner with the intention to forsake and desert it, forfeiture, upon the other hand, is the involuntary or forced loss of the right, caused by

*failure* of the appropriator or owner *to do or perform some act required by the statute.* Forfeiture is a 'punishment annexed by law to some *illegal act* or negligence in the owner of lands, * * whereby he loses all his interests therein.'

"The element of intent, therefore, so necessary in the case of an abandonment, is not a necessary element in the case of forfeiture. In fact a forfeiture may be worked directly against the intent of the owner of the right to continue in the possession and the use of the right. Therefore forfeiture as applied·to water rights and other rights in this connection is the penalty fixed by statute for the failure to do, or the unnecessary delay in doing, certain acts tending toward the consummation of a right within a specified time; or, after the consummation of the right, the failure to use the same for the period specified by· the statute."

We conclude that an appropriative right is lost by a non-beneficial user thereof for a period of four years. § 75–11–8, supra. Consequently, if the defendant obtained an appropriative right to the use of the water in question, any such right has now become lost by continuous nonuser, through waste, for more than four years as shown by the evidence.

The Legislature in passing §§ 75–12–6 and 75–12–12, was not attempting to prevent the use of water, but it was seeking to prevent the waste of water—our greatest natural resource. To more clearly illustrate the point—under the proof in this case the water flowed from the well in question, uncontrolled, twenty-four hours a day, without a constructed irrigation system or through pipes to water troughs fitted with float feeds to prevent waste therefrom, but says the defendant this was put to beneficial use in watering native grass and his livestock. To so construe the statute, in our opinion, would be to hold that the Legislature did a vain and useless thing which accomplishes no purpose in conserving our natural resources—but on the contrary, will permit the depletion thereof.

Water appropriators and appropriations on each of the artesian basins of the state are numerous. The State is vitally concerned in every appropriation. The need for water is imperative, and often the supply is insufficient. Such conditions lead inevitably to many serious controversies, and demand from the state an exercise of its police power, not only to ascertain rights, but also to regulate and protect them. Regulation, however, is not confiscation. The same may be said as to adjudication. In order to deal with a problem, difficult and peculiar, if for no other reasons because of the vast number of

parties and interrelated rights which may be involved, and the rule that no one has a right to use or divert water except for beneficial use is clearly indicated by the framers of our Constitution.

This beneficial use is determined in Millheiser v. Long, 10 N.M. 99, 61 P. 11; Hagerman Irrigation Co. v. Mc-Murry, 16 N.M. 172, 113 P. 823; First State Bank of Alamogordo v. McNew, 33 N.M. 414, 269 P. 56; State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421, to be the use of such water as may be necessary for some useful and beneficial purpose in connection with the land from which it is taken. The conditions existing in this state with reference to the necessity for the conservation of irrigating waters are most clearly set out in the case of Pecos Valley Artesian Conservancy District v. Peters, 50 N.M. 165, 173 P.2d 490, wherein the reasons for the rule restricting the use are clearly shown. When a land owner exceeds this use, he is appropriating to himself that which belongs to others who are entitled to a like use, and to that extent is obstructing the necessary use of water so as to interfere with its beneficial use, and which, by § 75–12–8, 1953 Compilation, is declared to be a public nuisance. Whatever right one has, even in his own, is subject to that established principle that his use shall not be injurious to the rights of others, or of the general public. No surface owner possesses the right to extract the subterranean water in excess of the quantity necessary to supply the beneficial uses to which it has been appropriated by him. Any additional extraction is not in the exercise of a right, if by such exercise the rights of others and the public are injuriously affected. Nor can an appropriator take more water than he can beneficially use. See, also, Yeo v. Tweedy, 34 N.M. 611, 286 P. 970; and State ex rel. Bliss v. Dority, 55 N.M. 12, 225 P.2d 1007.

Defendant claims that the action against him is barred on ground of estoppel by reason of laches on the part of the Artesian Water Supervisor, who had knowledge of the method employed by him in watering his native grass and livestock. The plaintiff contends that estoppel and laches do not run against the state, to prevent its acting in a governmental capacity, and we agree with this contention.

To govern themselves, the people act through their instrumentality which we call the State of New Mexico. The State of New Mexico functions through persons who are for the time being its officers. The failure of any of these persons to enforce any law may never estop the people to enforce that law either then or at any future time. It would be as logical to argue that the people may not proceed to con-

vict a defendant of burglary because the sheriff perhaps saw him and failed to stop him or arrest him for another burglary committed the night before. State ex rel. Fishback v. Globe Casket & Undertaking Co., 82 Wash. 124, 143 P. 878, L.R.A.1915B, 976; Department of Insurance of Indiana v. Church Members Relief Ass'n, 217 Ind. 58, 26 N.E.2d 51, 52, 128 A.L.R. 635; Mullan v. State, 114 Cal.578, 587, 46 P. 670, 34 L.R.A. 262.

The doctrine of estoppel by reason of laches does not aid the defendant. Public policy forbids the application of the doctrine of estoppel to a sovereign state where public waters are involved. The general rule is, that neglect or omission of public officers to do their duty cannot work an estoppel against the state. State ex rel. State Game Commission v. Red River Valley Co., 51 N.M. 207, 182 P.2d 421; Ross (State Tax Commission, Intervenor) v. Daniel, 53 N.M. 70, 201 P.2d 993.

The judgment is reversed and the cause remanded with instructions to the district court to set aside its judgment and to enter judgment for plaintiff, all in conformity with this opinion;

It is so ordered.

SADLER, McGHEE, COMPTON and KIKER, JJ., concur.