**Certiorari Granted, January 27, 2011, Nos. 32,713 and 32,717**

**IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO**

**Opinion Number: 2011-NMCA-011**

**Filing Date: October 29, 2010**

**Docket No. 28,860**

**HORACE BOUNDS, JR.,**

　　**Plaintiff-Appellee,**

**and**

**JO BOUNDS and THE SAN LORENZO COMMUNITY DITCH ASSOCIATION,**

　　**Plaintiffs,**

**and**

**NEW MEXICO FARM & LIVESTOCK BUREAU,**

　　**Intervenor-Appellee,**

**v.**

**STATE OF NEW MEXICO and JOHN R. D'ANTONIO, JR., New Mexico State Engineer,**

　　**Defendants-Appellants.**

**APPEAL FROM THE DISTRICT COURT OF GRANT COUNTY**
**J.C. Robinson, District Judge**

Hubert & Hernandez, LLC
Beverly J. Singleman
Stephen A. Hubert
Las Cruces, NM

for Appellee Bounds

Hennighausen & Olsen, L.L.P.
A.J. Olsen
Alvin F. Jones
Roswell, NM

for Intervenor

Gary K. King, Attorney General
DL Sanders, Chief Counsel, Special Assistant Attorney General
Santa Fe, NM

Brett J. Olsen, P.C.
Brett J. Olsen, Special Assistant Attorney General
Albuquerque, NM

Law Offices of Randall W. Childress, P.C.
Stacey J. Goodwin, Special Assistant Attorney General
Santa Fe, NM

for Appellants

Law & Resource Planning Associates, A Professional Corporation
Charles T. DuMars
Stephen Curtice
Patrick J. Redmond
Albuquerque, NM

for Amici Curiae 4 Daughters Land & Cattle Company, Great Western Ranch, LLC, Sanders Land & Cattle, Inc., Western New Mexico Water Preservation Association, and Verde Realty

Taylor & McCaleb, P.A.
Jolene L. McCaleb
Elizabeth Newlin Taylor
Corrales, NM

for Amicus Curiae New Mexico Ground Water Association

Basham & Basham, P.C.
Mark A. Basham
Santa Fe, NM

for Amicus Curiae New Mexico Association of Counties

Frank Katz, City Attorney
Marcos Martinez, Assistant City Attorney
Santa Fe, NM

for Amicus Curiae City of Santa Fe

Jane Marx, Attorney at Law, P.C.
Jane Marx
Albuquerque, NM

Janov Law Offices, P.C.
Gwenellen P. Janov
Albuquerque, NM

for Amici Curiae The Pueblo of San Felipe and The Zuni Tribe

Navajo Nation Department of Justice
Stanley M. Pollack
Bidtah N. Becker, Water Rights Unit
Window Rock, AZ

for Amicus Curiae The Navajo Nation

Luebben Johnson & Barnhouse LLP
Samuel D. Hough
Albuquerque, NM

for Amicus Curiae The Pueblo of Santa Ana

Sonosky, Chambers, Sachse, Mielke & Brownell, LLP
David C. Mielke
Albuquerque, NM

for Amicus Curiae The Pueblo of Isleta

**OPINION**

**SUTIN, Judge.**

**{1}**     We address the question whether New Mexico's domestic well statute (the DWS), NMSA 1978, § 72-12-1.1 (2003), is facially unconstitutional.  The DWS states that the New Mexico State Engineer shall issue domestic well permits to draw groundwater for domestic

3

use "[u]pon the filing of each application." The DWS is controversial because it requires the permit to be issued upon application without notice, and any prior evaluation by the State Engineer of the effect, if any, of the anticipated domestic water use on senior water rights in a fully appropriated basin.

{2}     Plaintiffs Horace Bounds, Jr. (Bounds), a senior water rights holder, and his wife, Jo Bounds, who was dismissed from the action as a party, sued Defendants State of New Mexico and John R. D'Antonio, Jr., New Mexico State Engineer (the State Engineer) (collectively, Defendants) for declaratory and injunctive relief. The New Mexico Farm and Livestock Bureau intervened as a party plaintiff. Bounds sought to declare the DWS facially unconstitutional and to prevent the State Engineer from issuing domestic well permits without first determining that unappropriated water was available, the permit would not impair senior water rights, and issuance of the permit was in the public interest.

{3}     Bounds claimed that the automatic issuance of domestic well permits under the DWS in a fully appropriated basin would necessarily impair his senior water right and place the domestic well permittees in a position of priority in violation of the doctrine of prior appropriation set out in Article XVI, Section 2 of the New Mexico Constitution (the priority doctrine). The district court agreed and declared that on its face the DWS was unconstitutional because it was an impermissible exception to the priority doctrine. The court required the State Engineer to administer domestic well applications no differently than all other applications to appropriate groundwater.

{4}     We hold that the DWS does not on its face violate the priority doctrine or constitute an impermissible exception to that doctrine. The priority doctrine is but a broad principle. The Legislature is authorized to enact laws providing for administration of appropriation of water. The DWS creates the procedure for issuing permits for appropriation of groundwater for domestic use. The State Engineer is authorized in legislation to administer the appropriation of water and to adopt regulations relating to that process.

{5}     The Legislature is authorized to enact laws providing for administrative enforcement of priority of use in times when water use by junior rights must be curtailed in order to protect against impairment of senior rights. Under statutory authority, the State Engineer has the continuing and steadfast duty to administer water use in a manner that protects senior water rights from impairment. Barring contravention of the priority doctrine, the Legislature can enact exceptions to already existing statutes relating to priority administration. It stands to reason that the Legislature relies on the State Engineer's sound and careful discretion in exercising curtailment authority when curtailment is necessary because of impairment of senior water rights due to existing or impending water shortages.

**BACKGROUND**

**A.     Background of Action**

{6}     Bounds owns irrigation rights with an 1869 priority as to waters in the "Upper Mimbres." In his complaint, Bounds challenged the constitutionality of the DWS on the

4

ground that it permits continued withdrawals of groundwater and takings of surface water to the detriment of his vested property rights. He complained that the DWS requires the State Engineer without the exercise of discretion to issue permits for domestic wells solely upon application for the permit despite impairment of his and others' senior water rights.

**{7}** Bounds complained about the issuance of prior and future domestic well permits despite existing drought conditions and previous serious water shortages, about the inability of the State Engineer to deny domestic well permits, and about unregulated withdrawals from permitted domestic wells. He sought to enjoin the State Engineer from issuing domestic well permits in the Rio Mimbres Stream System and/or the Mimbres Underground Water Basin because all water rights had been fully adjudicated and that there are no unappropriated waters remaining. Bounds also asserted that the DWS violates due process and constitutes an unconstitutional taking of his vested property right in violation of 42 U.S.C. § 1983, claims that the district court dismissed without prejudice.

**{8}** Defendants moved to dismiss based on ripeness along with other motions not pertinent to this appeal. Following an evidentiary hearing on ripeness and other issues, the court entered an order denying Defendants' motion to dismiss. The court denied Defendants' motion for reconsideration in which they attacked several of the court's findings and conclusions as lacking support in the record or as not necessary for any ultimate determination. Defendants filed a motion for summary judgment asking the court to determine that the DWS was constitutional and that there were no regulatory takings of Bounds' property. The parties then agreed that the district court should vacate the trial setting and, based on the record then before the court, the court would proceed to decide, purely as a legal issue, the single and dispositive issue of the constitutionality of the DWS.

**{9}** The district court filed a decision with findings of fact and conclusions of law. In regard to available water in the Mimbres Basin, the court found:

> 4.    The entire Mimbres Basin has been closed since 1972. In a closed basin there is no water available for appropriation.
>
> 5.    The entire basin has been adjudicated, including all ground water and surface water.
>
>       . . . .
>
> 23.   It is not logical, let alone consistent with constitutional protections, to require the [State Engineer] to issue domestic well permits without any consideration of the availability of unappropriated water or the priority of appropriated water.

As to the issue of any actual impairment of Bounds' water rights, the court determined that "Bounds does not have to suffer actual impairment to attack the constitutionality of the statute" and that it would "do little good for Bounds, and others . . . to sit idly and wait for

5

actual impairment." The court stated that "[i]t is not what has been done, but what **can be done** under a statute that determines its constitutionality."

**{10}** In regard to the State Engineer, the court found that the State Engineer "has long considered [the DWS] to be mandatory and, since 1953, has issued domestic well permits without regard to availability of unappropriated water or priority of appropriated water." The court also found that the State Engineer "has recognized its lack of power to protect senior water rights and has attempted, without success, to get the Legislature to amend [the DWS]." In addition, the court found that in the present case the State Engineer had decided that the DWS was constitutional and had indicated that "it may have regulatory authority to control domestic wells[,]" something the court found to be "questionable."

**{11}** Continuing its findings, the court stated that the State Engineer "testified he would not subject domestic wells to a priority call notwithstanding this [was] a derogation of his [constitutional] duty." The court further stated that the State Engineer had "**no** statutory or regulatory process in place to give senior appropriators procedural or substantive due process" and that "[s]enior appropriators do not even get notice of application, let alone a hearing." The court found that the DWS "lack[ed] any due process provisions to protect senior water rights from out of priority review of domestic well applications." The court also found that the lack of protection was a violation of due process, the State Engineer, the State, and the Legislature were charged with the protection of senior water rights owners' properties, and the DWS "ha[d] no due process safeguards including, but not limited to, notice to senior water right owners, a determination whether an application, if approved, will impair existing [water] rights or a hearing."

**{12}** In its conclusions of law, the district court's final judgment and decree declared the DWS to be unconstitutional as a matter of law and that the State Engineer was required to "administer all applications for domestic well permits the same as all other applications to appropriate water."

**B.** **Preliminary Matters: Issues Abandoned or Otherwise Not Pursued by the Parties**

**{13}** Having expressed the preference that this Court reach and decide the constitutional issue, Defendants have not pursued and have therefore abandoned their contention that Bounds' claims were not ripe. Bounds sought to invalidate the DWS on due process grounds in the district court. However, Bounds essentially acknowledged in oral argument before this Court that notice and opportunity to challenge a domestic well application was not an issue he was pursuing, because to make that an issue would mean that some domestic well permits (where the applicant has not purchased water rights) might be permissible; whereas, Bounds' position on appeal definitely is that no applications for domestic well permits in the Mimbres Basin should be granted. In addition, Bounds acknowledged in oral argument that his priority call request was not an issue he was interested in pursuing on appeal. Based on the foregoing, we therefore do not address the ripeness, due process, and priority call issues that were raised in the district court.

6

## C. Constitutional, Statutory, Regulatory, and Case Law Background

**{14}** The New Mexico Constitution, New Mexico's Water Code, the State Engineer's rules and regulations and orders, and our appellate courts' decisions, provide important background and guidance on issues of appropriation of water and priority of water rights. We set these authorities out as tools for understanding the parties' positions and the district court's rulings.

### 1. Constitution and Statutes

**{15}** Waters of the state belong to the public, and unappropriated waters are subject to appropriation for beneficial use in accordance with the laws of the state. N.M. Const. art. XVI, §§ 2, 3. The priority doctrine reads, "Priority of appropriation shall give the better right." N.M. Const. art. XVI, § 2. Our Legislature has enacted a comprehensive Water Code governing the appropriation of water. *See* NMSA 1978, §§ 72-1-1 to 72-20-103 (1907, as amended through 2009). The state is owner of waters, and the Legislature prescribes beneficial use. *State ex rel. Erickson v. McLean*, 62 N.M. 264, 271, 308 P.2d 983, 987 (1957). Section 72-1-2 provides that "[b]eneficial use [of water] shall be the basis, the measure and the limit of the right to the use of water[.]"

**{16}** The following provisions in the Water Code provide guidance on the issues before us. Section 72-2-1 establishes the State Engineer, who is given general supervision of the appropriation and distribution of state waters "and such other duties as required." Section 72-1-2 states that "[p]riority in time shall give the better right." Section 72-2-9.1, entitled "[p]riority administration," declares in Subsection (A) that the need for water administration is urgent and gives the State Engineer "authority to administer water allocations in accordance with the water right priorities." Section 72-2-9.1(B) requires the State Engineer to adopt rules for priority administration to ensure that the State Engineer exercises the given authority in three specific ways, namely, "(1) so as not to interfere with a future or pending adjudication; (2) so as to create no impairment of water rights, other than what is required to enforce priorities; and (3) so as to create no increased depletions." Section 72-5-6 requires the State Engineer to determine whether there is unappropriated water available for the benefit of an application seeking to appropriate water. Under Section 72-5-6, if water is available, the State Engineer may permit the appropriation if it is not contrary to the conservation of water and is not detrimental to the public welfare of the state. Under Section 72-5-7, if, in his opinion, there is no unappropriated water available, the State Engineer is required to reject the application.

**{17}** Underground water (groundwater) appropriation is the focus of Sections 72-12-1 to -28. Under Section 72-12-1, groundwaters that have reasonably ascertainable boundaries "belong to the public and are subject to appropriation for beneficial use." Generally, new appropriations of groundwater are governed by Section 72-12-3. Section 72-12-3(E) requires the State Engineer to issue a permit to appropriate groundwater upon making certain findings. He must find that there are "unappropriated waters or that the proposed appropriation would not impair existing water rights from the source[.]" *Id.* He must also find that the proposed appropriation "is not contrary to conservation of water within the state

7

and is not detrimental to the public welfare of the state[.]" *Id.* The permit and appropriation are "subject to the rights of all prior appropriators from the source." *Id.* The State Engineer acknowledges that in reaching a determination under Section 72-12-3(E), "the State Engineer has the positive duty to determine whether existing rights would be impaired." *City of Roswell v. Berry*, 80 N.M. 110, 112, 452 P.2d 179, 181 (1969); *City of Albuquerque v. Reynolds*, 71 N.M. 428, 433, 379 P.2d 73, 77 (1962).

**{18}** Before 1953 there existed no statutory distinction between domestic and non-domestic purposes of use in the application process for the appropriation of groundwater. *See, e.g.*, 1943 N.M. Laws, ch. 70, § 1 (amending § 77-1103, 1941 Comp. (1953 Supp.)); 1931 N.M. Laws, ch. 131, §§ 1, 3. The pre-1953 predecessor to Section 72-12-1 was amended in 1953 to codify administrative practices that excepted applications for domestic, livestock watering, and certain temporary uses from certain procedures required under the then predecessor to Section 72-12-3. *See* 1953 N.M. Laws, ch. 61, § 1; NMSA 1953, § 75-11-1 (Vol. 11, 1965 Pocket Supp.); § 77-1101, 1941 Comp. (1953 Supp.). Throughout several amendments after 1953, the Legislature continued to provide for an application process that did not require applicants for domestic water use to follow the general groundwater application requirements of Section 72-12-3 and its predecessors. *See, e.g.*, §§ 72-12-1, -1.1, -1.2, -1.3; 2003 N.M. Laws, ch. 298, §§ 1-4; 2001 N.M. Laws, ch. 207, § 2; 1998 N.M. Laws, ch. 50, § 1; 1959 N.M. Laws, ch. 193, § 1.

**{19}** In 2003 the Legislature amended Section 72-12-1 and moved the provisions relating to domestic wells, livestock wells, and temporary uses of water from Section 72-12-1 into three stand-alone provisions appearing in newly created Sections 72-12-1.1, -1.2, and -1.3, respectively. Section 72-12-1 now provides that

> [b]y reason of the varying amounts and time such [groundwater] is used and the relatively small amounts of water consumed in the watering of livestock; in irrigation of not to exceed one acre of noncommercial trees, lawn or garden; in household or other domestic use . . . application for any such use shall be governed by the provisions of Sections 72-12-1.1 through 72-12-1.3.

**{20}** Under Section 72-12-1.1 which, as we have indicated, we refer to as the DWS, one desiring to use groundwater for the limited domestic uses described in that section must file an application with the State Engineer, and the State Engineer "shall issue a permit to the applicant to use the underground waters applied for[.]" Section 72-12-1.2 establishes the same process for livestock well permits. Section 72-12-1.3 is different—applications for temporary uses for prospecting, mining, public works, highway and road construction, and certain drilling operations, require "an examination of the facts" by the State Engineer as to whether the proposed use will impair any existing rights of others. The DWS does not require the State Engineer to assess water availability or impairment of rights before issuing a domestic well permit.

**2.     Rules and Regulations**

**{21}** In December 2004, the State Engineer promulgated comprehensive rules and regulations to supervise "the physical distribution of water, to prevent waste, and to administer the available supply of water by priority date or by alternative administration, as appropriate." 19.25.13.2 NMAC (12/30/04). The stated objective is "to protect senior water right owners[.]" 19.25.13.6 NMAC (12/30/04). The rules and regulations "provide the framework for the promulgation of specific water master district rules and regulations." 19.25.13.9 NMAC (12/30/04).

**{22}** In December 2005, the State Engineer adopted Order No. 171. Citing statutory authorizations and based on findings of fact and conclusions of law related to the "Upper Mimbres Stream System," the State Engineer created the Upper Mimbres Water Master District "to include all surface water and groundwater rights within the area," and he authorized the appointment of a water master. The State Engineer based the need for a water master district on, among other findings:

2.   The amount of water in the [d]istrict is finite and varies from year to year based on annual spring run-off, which is dependent on annual precipitation, and on the amount of groundwater being diverted within the [d]istrict.

3.   A final decree in the adjudication of all water rights in the Mimbres Stream System and Mimbres Underground Water Basin was entered on January 14, 1993.

4.   The recent drought in the State of New Mexico has created a water shortage crisis in the Upper Mimbres Stream System.

5.   The shortage of water in the Upper Mimbres Stream System is a problem affecting the citizens of Grant County.

6.   Creation of the District is necessary to ensure the economical and satisfactory apportionment of water in the [d]istrict.

7.   Appointment of a [w]ater [m]aster is necessary to ensure the public safety of water users in the [d]istrict and to ensure protection of existing water rights in the [d]istrict from impairment.

**{23}** In July 2006, the State Engineer adopted Order No. 177, entitled "In the Matter of Priority Administration of the Direct Flow of the Mimbres River Within the Upper Mimbres Water Master District," hereinafter Priority Admin. Order No. 177. This order indicates that the State Engineer has a statutory responsibility to supervise the appropriation and distribution of state waters in accordance with the prior appropriation doctrine and further indicates that there is a need for conjunctive administration of surface and groundwaters. Priority Admin. Order No. 177, at 1. The order refers to "continued drought conditions" in New Mexico and indicates that "a priority call by one or more owners of water rights within the [Upper Mimbres Water Master] District can be reasonably anticipated before the district-

9

specific regulations can be promulgated [pursuant to] 19.25.13.9 NMAC." Priority Admin. Order No. 177, at 1. In addition, the order states:

> **WHEREAS**, the State Legislature has recognized that the need for water administration is urgent, . . . [Section] 72-2-9.1; and
>
> **WHEREAS**, the State Engineer determines that the need for water rights administration within the [d]istrict is so urgent that administration must proceed immediately by his [o]rder as provided at . . . 19.25.13.43 [NMAC (12/30/04)]; and
>
> **WHEREAS**, the Sixth Judicial District Court, Luna County entered its final decree adjudicating all water rights within the Mimbres River Stream System, but excluded from the adjudication rights to the use of groundwater for domestic and livestock purposes; and
>
> **WHEREAS**, all adjudicated, permitted and licensed water rights and all domestic and livestock wells are subject to curtailment under the prior appropriation system according to the adjudicated or licensed priority date or the priority . . . date of permit, but it is in the public interest that the State Engineer allow essential de minimis indoor domestic and livestock uses to continue; and
>
> **WHEREAS**, in curtailing diversions by the priority dates of the water rights within the [d]istrict, the [w]ater [m]aster is to allow limited diversions by owners of out of priority water rights sufficient to meet essential livestock and indoor domestic needs; and
>
> **WHEREAS**, the State Engineer encourages alternative administration or shortage sharing agreements in lieu of strict curtailment of all water rights junior in time to the priority date of the water right calling for water; and
>
> **WHEREAS**, water right owners in the Upper Mimbres Water Master District may enter into alternative administration or shortage sharing agreements in order to prevent implementation of or in response to priority administration in the [d]istrict[.]

Priority Admin. Order No. 177, at 2. Based on the foregoing and other facts or assumptions of the State Engineer stated in Priority Admin. Order No. 177, the State Engineer ordered that:

> **NOW THEREFORE**, I, John R. D'Antonio Jr., State Engineer of the State of New Mexco, do hereby order that, in the event of priority administration by the [w]ater [m]aster in the Upper Mimbres Water Master District, (1) all water rights in the Upper Mimbres Water Master District that are out of priority shall be curtailed and limited to essential indoor domestic

10

uses and all outdoor uses shall cease. Essential indoor domestic uses include drinking, cooking, indoor cleaning, sanitary, and cooling purposes, and exclude all uses made outside of a building; and (2) the [w]ater [m]aster will curtail out-of-priority groundwater and surface water rights for livestock purposes in order to limit such diversions to the relatively small amounts of water required for essential livestock watering.

> **IT IS FURTHER ORDERED** that this [o]rder is limited to the administration of the direct flow of the Mimbres River and hydrologically connected groundwater. [19.25.13.7 NMAC (12/30/04)].

> **IT IS FURTHER ORDERED** that the State Engineer will approve or conditionally approve an alternative administration plan proposed by water right owners within the [d]istrict if he determines, based on information contained in the plan, that the plan will effectively distribute the available water supply among the owners that have agreed to the system of alternative administration and will not impair the water rights of those that have not participated in the plan. [19.25.13.7(C)(4) NMAC].

Priority Admin. Order No. 177, at 2-3. The order further sets out objections and review procedures for owners of water rights to object to any act or failure to act of the water master. *Id.* at 3-4. Informal objections are made to the water master and, if the decision is adverse, the objector can obtain an evidentiary hearing before the Office of the State Engineer's District III Supervisor. *Id.* at 3. Under the order, the District III Supervisor's decision is final under Section 72-3-3 (relating to water districts) and subject to appeal pursuant to Sections 72-7-1 and 72-7-2, which set out procedures for an appeal to the district court. Priority Admin. Order No. 177, at 4.

{24}   In August 2006, the State Engineer promulgated regulations in regard to permits issued under the DWS. 19.27.5.13 NMAC (8/15/06). Importantly, the State Engineer established conditions of approval of an application under the DWS, among which are the conditions that he can limit the use of water and that the right to divert water is subject to curtailment by priority administration implemented by the State Engineer or a court. 19.27.5.13(A), (B)(8), (12) NMAC. Also in August 2006, the State Engineer promulgated 19.27.5.14 NMAC, which authorized the State Engineer to "declare all or part of a stream connected aquifer as a domestic well management area to prevent impairment to valid, existing surface water rights." Under this regulation, the State Engineer is authorized to "develop administrative guidelines for each declared domestic well management area." 19.27.5.14(A) NMAC. At the same time, the State Engineer promulgated 19.27.5.15 NMAC, entitled "Enforcement," that states that "[t]he holder of a 72-12-1.1 domestic well permit is subject to possible fines and remedial action including cancellation of the permit for any failure to comply with the terms and conditions of the 72-12-1.1 domestic well permit or any applicable provision of 19.27.5 NMAC or Chapter 72 NMSA." Regulation 19.27.5.15(B) also states that "[i]n any stream system where the [S]tate [E]ngineer has appointed a water master, the water master shall have authority to administer all 72-12-1.1 domestic well permits" and that all such permits "shall be subject to all applicable provisions

11

of district specific active water resource management regulations, including all enforcement provisions."

### 3.	Court Decisions

**{25}**	Although they do not involve the DWS, certain decisions of our Supreme Court referred to by the parties touch on arguments made in the present case and reflect present-day New Mexico surface and groundwater availability concerns. We discuss these decisions only as a backdrop to our discussion of the issues in the present case.

**{26}**	In *Montgomery v. Lomos Altos, Inc.*, 2007-NMSC-002, 141 N.M. 21, 150 P.3d 971 (filed 2006), the Middle Rio Grande Administrative Area "guidelines" issued by the State Engineer relating to review of water right applications recognized that the Rio Grande's surface waters were fully appropriated and that transfers of existing valid water rights were necessary before any surface water could be made available for new appropriations. *Id.* ¶¶ 8 n.6, 15, 18. Our Supreme Court clarified that the applications in question, which sought to change the point of diversion and the place and purpose of use of surface water rights to groundwater rights, were for "transfers" and not for new appropriations of groundwater. *Id.* ¶¶ 1, 3, 14-15. The Court indicated that "the State Engineer treats new groundwater appropriations as surface water right transfers which change the surface water right's purpose of use and diversion point," apparently based on several factors. *Id.* ¶ 18. But what seems to be an important factor may have been that "[t]he waters within the Rio Grande Underground Water Basin are considered to be hydrologically connected to the Rio Grande surface flows, so that any groundwater diversions in the system will eventually deplete the surface flows within the system in an equal amount." *Id.* ¶ 15.

**{27}**	The Court in *Montgomery* addressed the protestant's contention that "since it is uncontested that some depletion of surface waters will occur as a result of the [a]pplicants' transfer applications, per se impairment of [the p]rotestants' surface water rights will occur. In other words, any depletion at the move-to location should be considered impairment." *Id.* ¶ 21 (emphasis omitted). The Court considered this per se impairment contention "novel," after stating "this Court has refused to make any bright-line rule regarding what constitutes impairment." *Id.* ¶¶ 12, 21. And the Court stated: "[T]he question of impairment of existing rights is one which must generally be decided upon the facts in each case, and . . . a definition of 'impairment of existing rights' is not only difficult, but an 'attempt to define the same would lead to severe complications.'" *Id.* (alteration in original) (omission in original) (quoting *Mathers v. Texaco, Inc.*, 77 N.M. 239, 245, 421 P.2d 771, 776 (1966)). In discussing *Mathers*, which involved the Lea County, New Mexico, Underground Water Basin, "a non-rechargeable basin," the Court in *Montgomery* indicated that, in *Mathers*, "this Court refused to find impairment as a matter of law where a lower water level would result in increased pumping costs for the protestants," and the Court held that "the protestants' impairment theory would make any groundwater appropriation approval subsequent to the initial permit unlawful." *Montgomery*, 2007-NMSC-002, ¶ 22. The Court also relied on *Stokes v. Morgan*, 101 N.M. 195, 202, 680 P.2d 335, 342 (1984) in the same regard, quoting *Stokes'* statement that "[n]ew withdrawals which cause minimal

acceleration in the rate of saltwater intrusion or a minimal increase in salinity do not constitute impairment as a matter of law." *Montgomery*, 2007-NMSC-002, ¶ 22.

**{28}** In *Lion's Gate Water v. D'Antonio*, 2009-NMSC-057, ¶ 3, 147 N.M. 523, 226 P.3d 622, our Supreme Court stated: "The State Engineer interprets [the] enabling statutes [of Chapter 72] to require him, if he determines that no unappropriated water is available, to summarily reject applications to appropriate water, *see* [§ 72-5-7], as not being 'in the form required by the rules and regulations established by him.' [§ 72-5-1]." *Lion's Gate* involved the Gila River in New Mexico, which was recognized as being "overappropriated." 2009-NMSC-057, ¶ 4. The Court broadly stated:

> Whether water is available for appropriation is the threshold issue that is dispositive of a permit application when water is not available for appropriation. The Legislature, in creating an efficient and effective administrative process for water rights applications, recognized the dispositive nature of this threshold issue when it crafted New Mexico's [W]ater [C]ode and mandated in Section 72-5-7 that the State Engineer "shall" summarily reject water rights applications upon a determination that water is unavailable for appropriation.

*Id.* ¶ 25. Reading Section 72-5-7 "harmoniously" with Section 72-2-16, the Court concluded that "the Legislature intended the State Engineer to employ his or her authority to efficiently dispose of applications without a hearing whenever he or she determines that water is unavailable to appropriate." *Lion's Gate*, 2009-NMSC-057, ¶ 25. The Court stated that, under Section 72-5-7, the State Engineer "is *required* to reject the application," where the finding is that water is unavailable to appropriate, and further, that "[f]rom a determination that water is unavailable for appropriation follows the inevitable conclusion that any appropriation of water under these circumstances would be contrary to the conservation of water and detrimental to public welfare and prior water rights." *Id.* ¶¶ 26-27. We note that the appropriation of groundwater for domestic use and the application or constitutionality of the DWS were not at issue in *Lion's Gate*.

**{29}** Of note, in *Herrington v. State ex rel. Office of State Engineer*, 2006-NMSC-014, ¶¶ 1, 3, 139 N.M. 368, 133 P.3d 258, our Supreme Court addressed the plaintiffs' claim that their senior surface water rights relating to a tributary of the Mimbres River had been diminished by groundwater wells of junior rights. The plaintiffs sought to supplement their surface water rights with a well pursuant to the *Templeton* doctrine established in *Templeton v. Pecos Valley Artesian Conservancy District*, 65 N.M. 59, 332 P.2d 465 (1958). *Herrington*, 2006-NMSC-014, ¶¶ 1-2. The Court addressed what the plaintiffs' right was to a *Templeton* supplemental well under the *Templeton* requirements. The DWS was not an issue in the case, but important for the present case are the following closing comments of the Court regarding the DWS.

> Parenthetically, we note the difficulty presented by . . . Section 72-12-1.1 . . . which directs the State Engineer to issue permits to domestic well applicants subject to municipal ordinances. This requirement complicates the

13

State Engineer's efforts to manage a limited water supply in a sustainable way. Furthermore, we recognize the practical difficulty of terminating continued use of existing junior domestic wells when they result in a shortfall to senior appropriators. As a result, protecting the surface rights of senior appropriators . . . may prove difficult when many domestic wells draw from the same basin.

*Herrington*, 2006-NMSC-014, ¶ 50. Yet, note our Supreme Court's statement in *Reynolds* in which the Court stated:

It is an admitted fact that the surface waters of the Rio Grande are fully appropriated. It is also an admitted fact that the underground waters, in the area where the city proposed to drill its wells, contribute substantially to the flow of the Rio Grande, thus constituting a part of the source of the stream flow.

71 N.M. at 434-35, 379 P.2d at 77. The Court further stated:

Under the facts in this case, with the Rio Grande stream flow being fully appropriated, it would indeed be anomalous for the [L]egislature to enact laws designed to permit water, which would otherwise reach the stream in substantial quantities, to be withdrawn by pumps and thereby attempt to deprive the prior appropriators of their vested rights.

*Id.* at 437, 379 P.2d at 79.

**{30}**   The background of priority doctrine, statutes, regulations and orders of the State Engineer, and decisions of our appellate courts, reflects legislative, administrative, and judicial concerns about water appropriation, scarcity, and priority. This background of authorities shows obvious attempts through legislation and administrative regulations and orders to provide guidelines as well as rules for addressing those concerns. It seems fair to conclude that up to this point, although appellate decisions have shown that, generally, the State Engineer is not to allow and does not allow appropriation of water when none is available, none of the decisions can reasonably be read as explicitly or implicitly holding that, on its face, the priority doctrine forbids the Legislature from enacting a law making an exception to existing laws for new appropriations of groundwater for domestic use and allowing permits for wells for that use. With this background in mind, we turn to the issue of facial constitutionality of the DWS.

**DISCUSSION**

**The Issue of the Facial Constitutionality of the DWS**

**{31}**   In focusing on what the priority doctrine is and how it should be enforced, the district court in the present case found:

10.    The rule that priority of appropriation gives priority of right as between two appropriators from the same source of supply is an essential feature of the doctrine of appropriation.

11.    The right of a junior appropriator is at all times subservient to the rights of prior appropriators and can only be exercised after the needs of the prior appropriators have been supplied. *Harkey v. Smith*, 31 [N.M.] 521, 247 P. 550 (1926).

12.    The 1910 Constitutional Convention considered water rights, including domestic use.

13.    The 1910 Constitutional Convention refused to adopt a hierarchy of appropriation by **use** and enacted appropriation based on priority in **time**.

. . . .

15.    Laws 1953, Ch. 60 at 105, the predecessor to [Section] 72-12-1 through [Section] 72-12-1.3, created an exception to the prior in time appropriative right by exempting domestic wells and livestock.

. . . .

23.    It is not logical, let alone consistent with constitutional protections, to require the [State Engineer] to issue domestic well permits without any consideration of the availability of unappropriated water or the priority of appropriated water.

These findings are essentially conclusions that led the court to hold that the DWS was "an impermissible exception to the priority administration system created by" the Constitution.

**{32}**    Defendants' grounds for attack on the court's judgment declaring the DWS to be unconstitutional are that (1) the court failed to accord the DWS the presumption of constitutionality, ignored canons of statutory construction, and otherwise applied a flawed constitutional analysis; and (2) the court "incorrectly equated issuance of a permit with priority administration of water rights."

**Standard of Review and Rules of Construction**

**{33}**    The court entered a judgment under the Declaratory Judgment Act based on the summary judgment record before the court and the court's findings of fact and conclusions of law. We review Bounds' constitutional challenge under a de novo standard of review. *See State v. Druktenis*, 2004-NMCA-032, ¶ 14, 135 N.M. 223, 86 P.3d 1050 (applying a de novo standard of review to challenges to a sex offender registration statute on grounds that the statute violated the ex post facto clauses and substantive and procedural due process).

15

"We interpret the Constitution and determine whether the law was properly applied to the facts through de novo review." *Id.* (internal quotation marks and citation omitted). Appellate courts "give no deference to the district court's conclusions of law." *Chapman v. Varela*, 2009-NMSC-041, ¶ 5, 146 N.M. 680, 213 P.3d 1109. "When conclusions of law are listed as facts, we do not afford them any deference in our review." *Ortiz v. Overland Express*, 2010-NMSC-021, ¶ 28, 148 N.M. 405, 237 P.3d 707. An appellate court is not bound by a district court's legal conclusions and may independently draw its own conclusions of law on appeal. *In re Estate of Duran*, 2003-NMSC-008, ¶ 14, 133 N.M. 553, 66 P.3d 326. Rather than defer to the district court's legal conclusions, "we determine whether the court correctly applied the law to the facts of the case." *Romero Excavation & Trucking, Inc. v. Bradley Constr., Inc.*, 1996-NMSC-010, ¶ 5, 121 N.M. 471, 913 P.2d 659.

**{34}** "It is well settled that there is a presumption of the validity and regularity of legislative enactments. Indeed, we must uphold such enactments unless we are satisfied beyond all reasonable doubt that the Legislature went outside the bounds fixed by the Constitution in enacting the challenged legislation." *State ex rel. Udall v. Pub. Employees Ret. Bd.*, 120 N.M. 786, 788, 907 P.2d 190, 192 (1995) (internal quotation marks and citation omitted). "It is not the province of this Court to inquire into the wisdom or policy of an act of the Legislature." *Id.* "It is . . . a fundamental principle that courts will not declare a legislative act unconstitutional if there is any reasonable basis upon which it can be upheld." *Amador v. N.M. State Bd. of Educ.*, 80 N.M. 336, 337, 455 P.2d 840, 841 (1969). We are to adopt a construction of a statute that upholds its constitutionality. *Johnson v. N.M. Oil Conservation Comm'n*, 1999-NMSC-021, ¶ 17, 127 N.M. 120, 978 P.2d 327.

> We presume that the Legislature has performed its duty, and kept within the bounds fixed by the Constitution. [I]f possible, we will give effect to the legislative intent unless it clearly appears to be in conflict with the Constitution. We will not question the wisdom, policy, or justness of a statute, and the burden of establishing that the statute is invalid rests on the party challenging the constitutionality of the statute. An act of the Legislature will not be declared unconstitutional in a doubtful case, and . . . if possible, it will be so construed as to uphold it.

*State ex rel. Office of State Eng'r v. Lewis*, 2007-NMCA-008, ¶ 37, 141 N.M. 1, 150 P.3d 375 (filed 2006) (alteration omitted) (omission in original) (internal quotation marks and citations omitted).

> Statutes are enacted as a whole, and consequently each section or part should be construed in connection with every other part or section, giving effect to each, and each provision is to be reconciled in a manner that is consistent and sensible so as to produce a harmonious whole. . . .
>
> [] The general purpose of the water code's grant of broad powers to the State Engineer, especially regarding water rights applications, is to employ his or her expertise in hydrology and to manage those applications through an exclusive and comprehensive administrative process that

16

maximizes resources through its efficiency, while seeking to protect the rights and interests of water rights applicants. An exclusive and comprehensive administrative process is one that provides for a plain, adequate, and complete means of resolution through the administrative process to the courts.

*Lion's Gate*, 2009-NMSC-057, ¶¶ 23-24 (internal quotation marks and citations omitted). In a facial attack on a statute's constitutionality, we look at whether there exists a set of circumstances in which the statute can be constitutionally applied. *American Falls Reservoir Dist. No. 2 v. Idaho Dep't of Water Res.*, 154 P.3d 433, 443 (Idaho 2007).

**Analysis of Constitutional Issue**

**{35}**     Bounds focuses on a single point that is consistent with the district court's view of the priority doctrine and the DWS. The point is best summarized as follows. All of the waters in the Mimbres Basin are fully appropriated. No unappropriated waters are available for further appropriation. The Mimbres Stream System water rights have been fully adjudicated. Additional appropriation from domestic well permits will necessarily deplete waters that are already fully appropriated and will necessarily impair senior water rights. Thus, the automatic permitting of wells for domestic use under the DWS necessarily gives a use priority to domestic well appropriators over senior water rights forbidden under the priority doctrine. And the priority doctrine constitutionally trumps this legislative attempt in Section 72-12-1.1 to create an exception that permits such priority in use.

**{36}**     The district court's holding that the DWS "creates an impermissible exception to the priority administration system created by N.M. Constitution [a]rt. XVI, § 2" indicates a view that the priority doctrine contemplates a particular or definite priority administration system to which the Legislature must adhere and from which the Legislature cannot deviate. For the reasons that follow, this view is not supported in the Constitution or statutes and is not sustainable as support for a conclusion that the DWS is facially unconstitutional.

**{37}**     The Constitution's priority doctrine establishes a broad priority principle, nothing more. The prior appropriation provision is not self-executing. In *Lanigan v. Town of Gallup*, 17 N.M. 627, 633, 131 P. 997, 999 (1913), our Supreme Court stated the rule on self-executing provisions as follows: "A constitutional provision may be said to be self-executing when it takes immediate effect and ancillary legislation is not necessary to the enjoyment of the right given, or the enforcement of the duty imposed. In short, if a constitutional provision is complete in itself, it executes itself." The Court held that Article IX, Sections 12 and 13, regarding elections relating to the issuance of bonds, were not complete in and of themselves and that legislation was "necessary to the enjoyment of the right given." *Lanigan*, 17 N.M. at 633, 131 P. at 999; *see also State ex rel. Noble v. Fiorina*, 67 N.M. 366, 367-68, 355 P.2d 497, 498 (1960) (holding a sentence in Article XX, Section 4 of the New Mexico Constitution as not self-executing and as merely indicating a principle without laying down governing rules); *Jaramillo v. City of Albuquerque*, 64 N.M. 427, 430, 329 P.2d 626, 628 (1958) (holding an Article XX, Section 19's wage-related requirement

not to be self-executing but instead a declaration of principle or policy requiring legislation to give it effect).

**{38}** The Legislature establishes the administrative process required for adherence to the broad constitutional principle. Thus, the Legislature has the authority to enact laws setting out the process and to enact exceptions to or deviate from those laws. *See Lewis*, 2007-NMCA-008, ¶¶ 37-40 (indicating that the priority doctrine can be read "to permit a certain flexibility . . . in attempting to resolve the longstanding . . . water issues" and further stating that "although priority calls have been and continue to be on the table to protect senior users' rights, such a fixed and strict administration is not designated in the Constitution or laws of New Mexico as the sole or exclusive means to resolve water shortages where senior users can be protected by other means"); *see also Cent. Colo. Water Conservancy Dist. v. Simpson*, 877 P.2d 335, 344 (Colo. 1994) (en banc) (holding rights established by Colorado's constitutional priority doctrine not to be absolute because "[s]uch a view would create impossible obstacles to any effective administrative policies designed to effectuate the constitutional scheme" and reiterating the court's recognition that Colorado's "General Assembly may impose reasonable regulations on the manner and method of appropriation").

**{39}** Pursuant to the several statutes relating to the administration of the appropriation and use of water, including priority administration, the State Engineer must see to it that senior water rights are not impaired by new appropriations. The State Engineer is to adopt rules and regulations. Looking at the rules and regulations and the orders of the State Engineer as set out earlier in this opinion, it appears that the State Engineer gets the message, at least on paper.

**{40}** The Legislature has not detailed the specific conditions of water availability existing on the ground that necessarily require and trigger enforcement of priority to protect senior rights against impairment. Neither the Legislature nor the State Engineer has detailed at precisely what point in time of scarcity the State Engineer must act to protect senior rights by curtailing use. It is not unreasonable for senior rights in a fully appropriated basin to be concerned in times of water shortage about impairment or impending impairment of their senior rights. The acknowledged difficulty facing both the senior-right owner and the State Engineer is evaluating under what circumstances, and precisely when and in what manner, the State Engineer needs to act to protect the senior rights. We note that, in instances not involving domestic water use, the State Engineer has refused to permit new appropriations when the State Engineer had determined that water was unavailable for appropriation. *See, e.g.*, *Lion's Gate*, 2009-NMSC-057, ¶ 25; *In re Waterfall Cmty. Water Users Ass'n v. N.M. State Eng'r*, 2009-NMCA-101, ¶¶ 5, 12, 20, 147 N.M. 20, 216 P.3d 270. Under the DWS, however, the Legislature has required that domestic well permits be issued without prior evaluation of water availability. The present case is a showcase of the festering issue involving senior water rights owners, the Legislature, and the State Engineer, with respect to the continuing proliferation of new applications for permits for domestic water use.

**{41}** The Legislature implemented the DWS process "[b]y reason of the varying amounts and time [groundwater] is used and the relatively small amounts of water consumed . . . in household or other domestic use[.]" Section 72-12-1. The State Engineer's view on whether

18

water for domestic use is available in an otherwise fully appropriated basin with no unappropriated water was explained as follows.

> I think if you had an engineer up here and were to testify with respect to an application for one acre foot of water for domestic use, I think he would be hard pressed to be able to state with any degree of certainty that there is . . . adequate unappropriated water available to satisfy a tenth of an acre foot of depletion.

These legislative and administrative views reflect an approach that attempts to fairly meet domestic water use demands and to balance economic proof burdens while leaving priority administration in the hands of the State Engineer, if and when such administration is required.

**{42}**     We are satisfied that a particular priority administration process is not dictated by the priority doctrine but instead is in the Legislature's hands pursuant to its authority to enact statutes providing for the administration of appropriation and use of surface water and groundwater. The Legislature has enacted statutes intended to limit appropriation and use in circumstances in which the State Engineer determines that a basin is fully appropriated with no available water for new appropriations. *See* §§ 72-2-9.1, 72-5-6, -7, 72-12-3. Yet, we see no reason why the Legislature cannot enact exceptions to or variations of the laws. The DWS is such an exception or variation, ultimately leaving for the State Engineer, as difficult as it looks to be, the administrative determination whether to curtail domestic use when senior water rights are impaired or threatened with impending impairment because of water shortages.

**{43}**     We must presume that the Legislature understands the criticality of and balance needed for resolving the tension and clash between unavailability of water in fully appropriated basins and the declared need to provide well water for new domestic use. We must also presume that the Legislature has considered and weighed the burdens of expense and proof when assessing whether to require applicants for domestic well permits to initially prove that the use will not impair existing rights or whether to leave to senior water rights owners the burden of showing that a permitted use will impair their rights. We further must presume that the Legislature has determined that it sees the hydrological expertise of the State Engineer as the preferable, if not the only reasonable way to attempt to reach the right balance of priorities and needs. It is up to the Legislature and the State Engineer to create an efficient, effective, and fair administrative process to reach the required balance and to protect senior water rights. Bounds' and other senior water rights owners' concerns should be addressed not to the facial constitutionality of the DWS but instead through the political process to the wisdom and propriety of the DWS, or through the administrative and judicial processes with regard to the administrative failure of the State Engineer to abide by his administrative duties.

**{44}**     In the district court in this case, the State Engineer confirmed that water rights owners can request the water master to engage in priority administration and that the State Engineer provides "the opportunity for hearings to determine whether relief requested from

the [w]ater [m]aster should be granted." To support that statement, the State Engineer cited Section 72-3-3 as "unequivocally provid[ing]" that "[a]ny person may appeal from the acts or decisions of the water master to the [S]ate [E]ngineer, who shall promptly and at a stated time and place to be fixed by him, upon due notice to the parties, hear and determine the matter in dispute[.]" In further support, the State Engineer cited the same statute as "provid[ing] for further relief if [Bounds] still [is] not satisfied, through an appeal 'taken to the district court of the county, wherein the irrigation works or the irrigated lands involved in such dispute are situated, in conformity with the provisions of Sections 72-7-1 and 72-7-2.'" Priority Administration Order No. 177 set out earlier in this opinion also discusses avenues for hearing objections.

{45} In sum, we conclude that the priority doctrine is not a system of administration. It does not dictate any particular manner of administration of appropriation and use of water or how senior water rights are to be protected from junior users in time of water shortages. That the Legislature determines that domestic well permits are to be issued upon application without prior evaluation of water availability or impairment is not, in and of itself, a per se violation of the priority doctrine or of the Legislature's constitutional duty to assure that senior water rights are protected under the priority doctrine. Although a basin is considered fully appropriated with no unappropriated water available, we do not see how the Legislature is forbidden under a facial constitutional attack from nevertheless enacting an exception to its existing statutory regime permitting additional appropriation for domestic purposes as long as senior water rights are not in fact impaired or subject to impending impairment because of water shortages requiring priority administration to protect those rights.

{46} Amici for and against affirming the district court's judgment present insightful practical and policy arguments for their positions. We appreciate receiving those arguments. The issues Amici have raised should be addressed by the Legislature rather than through a facial attack on the statute's constitutionality. Amici's arguments surely have been on the plates of the Legislature and the State Engineer on more than one occasion; if not, they presumably will get there. In the present case, we have not seen a reason to rely on the Amici arguments in reaching our decision. Nevertheless, we think it noteworthy to point out various concerns expressed by Amici briefs.

{47} The Amici brief of three Pueblos, the Zuni Tribe, and the Navajo Nation (designating themselves as "Amici Tribes") express several concerns. One concern is the adverse impact that automatically permitting a proliferation of domestic wells will inevitably have on owners of senior water rights. Amici Tribes contend that leaving Amici Tribes and senior water rights owners to court resort provides no comfort where, in the real world, courts are not likely to curtail domestic water use after large residential developments or other, individual homes have been constructed. As well, Amici Tribes assert that "[i]t is unlikely . . . senior rights holder[s] could ever successfully enjoin impairment on a well-by-well basis" or that they would meet the "burden of demonstrating likelihood of success on the merits, because it is the cumulative effect of many new domestic wells—not the isolated effect of each single new domestic well—that results in the impairment." As law and practice stand, Amici Tribes state, threats to tribe and senior water rights cannot "be evaluated until after the damage has already been done." Amici Tribes state:

It is the cumulative effect of the unregulated proliferation of domestic wells that is creating the crises that tribes and other senior rights holders disproportionately bear. The State Engineer's current practices and procedures simply do not adequately deal with the real problem. The real problem can be dealt with only through a comprehensive legislative solution or through an administrative scheme with sufficient authority, funding, and governmental will to make it work.

(Footnote omitted.)

**{48}** Amici New Mexico Association of Counties and City of Santa Fe express land-use concerns. The Counties point to a "great deal of growth in counties throughout the [S]tate of New Mexico particularly on the urban fringe of the larger metropolitan areas" and to long-established agricultural use in rural areas. They contend, for example, that while they "are required to plan for sustainable and harmonious development[,] they do not have any say in domestic well approvals utilized as a source of water for . . . developments." According to the Counties, this situation interferes with their ability to engage in effective and orderly planning for growth, development, and sustainability in counties. The Counties complain that the automatic issuance of domestic well permits carries with it no assessment of the detrimental impact on the public welfare.

**{49}** The City is similarly concerned "with the proliferation of domestic wells" and points out that although the City has the power to deny permits for wells proximate to City water lines, its domestic well ordinance does not solve the proliferation of wells at a distance greater than 300 feet from a City water line and that, while the State Engineer "examines the impacts that the City's wells have on domestic wells, [he] makes no examination of what impact domestic wells have on the City's water rights."

**CONCLUSION**

**{50}** We reverse the district court's judgment holding that the DWS is facially unconstitutional. We also reverse and set aside the judgment and order requiring the State Engineer to administer domestic well water applications no differently than all other applications to appropriate water.

**{51}** **IT IS SO ORDERED.**

 

_____
**JONATHAN B. SUTIN, Judge**

**WE CONCUR:**

_____
**ROBERT E. ROBLES, Judge**

_____

21

**LINDA M. VANZI, Judge**

**Topic Index for *Bounds v. State*, Docket No. 28,860**

**AE**            **APPEAL AND ERROR**
AE-SR            Standard of Review


**CT**            **CONSTITUTIONAL LAW**
CT-DP            Due Process
CT-NM            New Mexico Constitution, General
CT-TC            Taking Without Compensation


**GV**            **GOVERNMENT**
GV-SE            State Engineer


**NR**            **NATURAL RESOURCES**
NR-WL            Water Law


**ST**            **STATUTES**
ST-CN            Constitutionality
ST-LI            Legislative Intent
ST-RC            Rules of Construction